# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. SAG-22-366 |
| | * | |
| ANNA GABRIELIAN & | * | |
| JAMIE LEE HENRY, | * | |
| | * | |
| Defendants. | * | |

## GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE MENTION OF ENTRAPMENT IN OPENING STATEMENTS

The United States of America moves for an order prohibiting the Defendants from mentioning an entrapment defense in their opening statement. Neither Defendant can meet the burden of production for making an entrapment defense, and mentioning such a defense in opening statement will only serve to confuse the jury.

### 1. Background

On February 24, 2022, Russian President Vladimir Putin announced a "special military operation" into Ukraine, and immediately thereafter Russian missiles struck Ukraine and Russian military forces began a ground incursion into the country. President Biden characterized the Russian attack as a "brutal assault on the people of Ukraine without provocation, without justification, without necessity," and authorized additional sanctions against Russia. In announcing the sanctions, President Biden stated: "Some of the most powerful impacts of our actions will come over time as we squeeze Russia's access to finance and technology for strategic sectors of its economy and downgrade its industrial capacity for years to come." ECF 1, ¶ 4.

Five days later, Anna Gabrielian, a naturalized U.S. citizen from Russia and an anesthesiologist at Medical Institution 1 in Baltimore, called[1] and emailed the Russian Embassy in Washington, D.C.. Gabrielian emailed: "Good afternoon, My husband and I are both doctors. I'm an anesthesiologist, he works in [critical care or ICU]. We are ready to help if there is a need. We support life, and do not want to cut Russia off from the international community."[2] In her call, Gabrielian stated that she and her husband were "ready to help."[3] At the time, Gabrielian's husband, Jamie Lee Henry was a Major in the Untied States Army stationed at Fort Bragg, North Carolina, and he held a Secret level security clearance. Fort Bragg is the home of the Army's XVIII Airborne Corps, headquarters of the United States Army Special Operations Command, and the Womack Army Medical Center. ECF 1, ¶ 3.

    i. <u>Meeting 1: August 17, 2023, 7:00AM Outside Medical Institution 1</u>[4]

On August 17, 2022, an FBI Undercover ("UC") approached Gabrielian as she went into work Medical Institution 1. Gabrielian asked if the UC had been sent by the Embassy, and the UC replied she had. Gabrielian told the UC she wanted to meet after her shift was over, since she was going to work. Gabrielian volunteered to the UC "[Y]ou know that my husband – he is also willing to help.[5] Gabrielian promised to text the UC later that day. ECF 1, ¶¶ 5-6.

    ii. <u>Meeting 2: August 17, 2023, 3:30PM at the Undercover Agent's Baltimore Hotel</u>

As she finished work, Gabrielian texted the UC asking to meet up, and the UC met later that day in the UC's hotel room in Baltimore. After discussing Gabrielian's job and her family,

---

[1] Gabrielian told the UC that she had placed a call to the Russian Embassy.
[2] The original email was in Russian; this is a translation.
[3] Gabrielian relayed this information about the call to the UC in their first hotel room meeting on 8/17/2023.
[4] The material in these meetings comes from the audio and video recordings done by the Undercover Agent. The Government and the Defense are still working on finalizing verbatim transcripts of these recordings for use in Court. The best currently available translations have been used here.
[5] This quote is a translation from Russian.

the UC asked for 'what kind of help you could offer, because the current situation is so tense?'[6] Gabrielian told the UC she 'wanted to know . . . how I could be of best and biggest help to you. I mean having a doctor, which is one of the directors at Medical Institution 1, but to tell the truth, every second person at Medical Institution 1 is a director. It's helpful to have such a person who would act in favor and establish the connection somehow.'[7] Gabrielian further stated: 'But if there's something else, I am also ready to help. But I would not want, for the sake of some risky undertaking, to lose my career, freedom, and everything else. If it is a risky undertaking. I mean it is silly to just jump up and shout that here I am helping – I think it wouldn't be good for either you or me. Because what can I actively do now to help? And I am not sure how to do it best."

The UC replied: 'But when you said that your husband and you were ready to help, did you have any specific idea? May be, you were hinting at something? Because I… My job is to collect information and to pass it on. And it's like with this information we will work [with] me what to tell you. But honestly speaking I don't even know what projects could be initiated, because I am not an expert in this business."

Gabrielian responded, "I am hinting that if my husband and I are in the position, in which we could do anything to help in any way, we would do it. I mean my hint was, well, taken correctly. We… I am also not an expert in this field. That is, it's not like I go and know what to offer . . . I mean I am offering help, but I do not know what exactly."

The UC asked: "Would this help only apply to the medical field or also to some other ones, well, because…" Gabrielian responded: "Other one that would be necessary. If they are needed." The UC responded: "Because Medical field is good, but we are currently focused so much on…" Gabrielian interjected: "other ones." The UC stated: "Other ones…On other things, right? So, help

---

[6] Unless otherwise noted, all conversations in this meeting are translated from Russian.
[7] This quote is a translation from Russian.

3

in that specific area would be invaluable. That is, any such, well not really insight, but any, like, support in this regard… if you husband had any access…" Gabrielian responded that Henry would tell the UC "absolutely everything that he knows." Gabrielian continued: "And he was affected as well, just like me, that it is all covered in the news very unevenly and they tell it very unevenly. And, plus, he was kicked out of the army, therefore he is not especially happy now. But he is a doctor in the army. I mean how much more information he would have I honestly do not know. Because I did not get deep into such things."

Gabrielian offered to have her husband come to meet the UC, and stated that she "would not, precisely, want to just waste it all for the sake of some silly risky venture." Gabrielian continued: "I mean, if he indeed provides you with the necessary information, if I cannot give you the necessary information, then we would not want to loudly wave our arms around and yell that this is what we are doing."

The UC then asked Gabrielian, "Let's go back once again, like, to your specialty specifically, and could you, well, describe at least a little bit in what area this help could be applied in due to the current conflict situation." They then began to discuss potential collaborations with Russian medical institutions. Gabrielian then stated that she would 'Share protocols. I mean whatever we have at [Institution 1], you have it too, if you want it.' Gabrielian further stated, 'I think my husband could explain and tell you more. Because . . . even there are those clinics . . . as to how set up a hospital for the wounded. I mean what items are needed there… I mean, he has all this information. I mean he is a more important person right now, than me."

The UC asked Gabrielian: "Have you told him about our cooperation?" Gabrielian replied: "No, but I told him when I sent that email . . . But at the same time, he was not included on that email, so he can say that [I] just went crazy and misunderstood me. . . And now I simply, if anyone

asks me, I will say that we met talked about how to restore medical knowledge. And, well, I was so glad that I wanted for my husband to also meet with them – such good Russian people, they want to restore the knowledge, that's why we met." Gabrielian continued, "'I'm also a little bit scared to meet with you right now, because if it goes wrong... I mean our story is great, we met for humanitarian support, but if something different . . . . to be told, it will be unpleasant."

Gabrielian continued: "I mean I trust and I want to help but it's not that I am going into it with those big eyes, well being naive. I mean I understand that there is risk involved, even though now it's minimal. I think he would also understand this risk and if I am sitting here next to him – it's one thing, but if he has to sit by himself and I am not here, then he might be less motivated to look brave."

Gabrielian further told the UC: "I mean I didn't send that e-mail just for the sake of it and I thought what to write and how to write it. And, truly, this is not just some adventure. I mean, even without it, I am up to my neck in thrill in my daily life. And I neither want money, nor I want that anyone knew much about it. I especially don't want anyone to know. . . . I mean it's true. I don't want to get anything like that other than to help Russia, because what's happening to it right now is not pleasant for me and I simply, how can I watch such injustice and do nothing. Besides, I can see how much… I mean I have to tell you right away, when I came to [Medical Institution 1] I worked with a Ukrainian doctor, and I can see how much he is helping his country. How can can I not do even such smallest thing as to meet with a person and try, maybe, to help in some way."

Gabrielian and the UC proceeded to have a discussed about different was to do ultrasounds, and Gabrielian stated that a colleague of her had helped bring new medical technology to Ukraine and, "Because he really [U/I] and was helping a lot and I wanted so much to then transfer this

5

program to Russia. I have even received the details of the hospital where I was born so that I can start from them specifically and then [U/I] everything went out of the window, yes. Yes, because he changed the entire medical system a lot. Just one person! And how can I not do it."

Gabrielian and then stated to the UC, 'My Jamie can tell you specifically about how they set up a hospital in the army, a field hospital, and about training programs." The UC asked "during [Henry's] training do you think they, like, showed all of these protocol, which were for them specifically, right? Gabrielian replied, "Yes." The UC stated: "And could he do the same for us?" Gabrielian replied, "Yes, I think, he still has access." The UC asked if the material was "confidential" or required a clearance to access. Gabrielian replied, "No." She told the UC that Henry "still has his laptop from work . .. So he could give you the documents, which are quite widely circulated in the army. This is, he is not the only holder of those documents. Every 3rd or 4th soldier [has access]."

The UC asked: "Does he currently have anything on him" Gabrielian stated: "I think it's on the internet." The UC stated: "I think it would be very suitable if he had some kind of official access to some documents." Gabrielian told him that "everything is widely spread."

The UC and Gabrielian discussed coordinating with Henry to come speak with the UC. After that conversation, Gabrielian stated, 'But on the other hand, as you said, it is not a fair game, yes? That is, one country [Ukraine] is helped by the whole world, and we, one can say…therefore, the second country [Russia] needs to be helped as well." The UC responded "Uh-huh." Gabrielian continued, "No, I mean, when I offered, I knew what I am offering. Very good information. . . . Meaning what can I do?" The UC replied, "Uh-huh." Gabrielian continued, "Well yes, someone might [unintelligible] important of information. I can access the chart once, for which they will fire me with a bang. So . . . meaning from the institute . . . I can say that these are my colleagues .

. . This is international work . . . But if I were to open charts for a person where I just want to know something . . . they will fire me, right?"[8] The UC responded, "So they can trace?" Gabrielian answered "Completely, Yes." The UC asked, "And it will show up." Gabrielian responded, "Oh yes, and when you open it, they check it . . . Now they started reviewing documents a lot. And the same from Jamie, you can see where he worked. Jamie has access to it, but he can look at it only once and that's it. . . So as for this information, we cannot give it to you. If we do give it, then that's it. It shouldn't simply provide some abstract help[.]."

The UC interjected: "We don't want to subject you to this.:" Gabrielian continued: " if it was some global situation, then I would be ready to do it. After this you could totally say bye-bye to Russia, bye-bye to the States, and go to Russia because here I would not be able to find a good job[.]"

Gabrielian proceeded to call her Henry, and told the UC that, "He will sleep for half an hour and then make a decision" regarding whether he would come to Baltimore.. Gabrielian and the UC arranged to meet up, and Gabrielian stated: "If anyone asks then we are just discussing some international affairs." Gabrielian told the UC she would "we can say [you are] from the Moscow Institute."

After the UC emphasized that she didn't want Henry to "be trapped, that later he, for example, would not feel comfortable to leave." Gabrielian stated that she had shown Henry the email, and that he agreed with it at the time it was sent. They ended their conversation and agreed to meet up again later that night.

    iii. Meeting 3: August 17., 2022, 8:00PM at the UC's Hotel Room

---

[8] "Charts" in the medical profession refer to patient charts, usually an electronic medical record. *See, e.g.*, EMR v. HER, What Is the Difference, January 4, 2011, available at https://www.healthit.gov/buzz-blog/electronic-health-and-medical-records/emr-vs-ehr-difference ("Electronic medical records (EMRs) are a digital version of the paper charts in the clinician's office. An EMR contains the medical and treatment history of the patients in one practice.").

7

That evening, Gabrielian, Henry, and the UC met in the UC's hotel room. After discussing various American sports, the UC told Henry, "I don't know much Anna has mentioned." Henry replied, "Not much. Just she mentioned that she wrote some emails, couple of months ago." Henry further stated that he had done "research myself, when Russia was taking volunteers, you know, and I was like, oh, getting on the army, I knew a couple people . . . like they want medics, they don't want doctors, at least that's what I could find. So, and people with combat experience which I have none."

The UC told Gabrielian and Henry, "So I guess the purpose of me being here is not just to follow up on our communication, but to find friends , right, who can contribute in one way or another to the cause. And the cause is to not let the world to basically trample Russia and kind of take advantage of the situation where everybody united against. And, you know, now people, as you correctly mention, are being ostracized. And if we can do it in a way that we are unable to do through other means, we very happy to accept that help. And by other means, I mean you know like things that perhaps are not known to the general public."

Gabrielian told the UC: "We have more to lose than we to do to gain from this. And it's really my love of country that's driving me].]" Henry interjected: "For me, it's my hate of war and just … You know the United States; I think the United States… My experience, having been in the military for 22 years, is we instigate a lot. And we are very arrogant and what we think we know and what we can do with the tools that we have. You know, and it has hurt many, many people across the globe. And I don't see how constitutionally, you know, reading the American constitution and what I've sworn to defend, how this hegemony can persist, you know, without dire consequences to our own United States, you know, being suffering." Henry continued, "You know, the way that I am viewing what's going on right now in Ukraine is that the United States is

using Ukrainians as a proxy for their own hatred towards Russia. And I think the current administration has hatred towards Russia because Hillary Clinton lost in 2016. And I think Obama was offended by Putin because [he's a weak] man. And he's intimidated by the values that Putin has. Just as many Americans are offended by Trump in the way that he presents himself. And I think it's personality-driven partly, and a lot of people are dying as a result of people's arrogance and personality, you know…"

Gabrielian interjected: "I think we're on the same page though. What we should discuss is what are the systems that we can provide. And then the [inaudible] system is easy because I can provide a link to a legitimate hybrid institution." Henry stated: "I'm about to work at [Medical Institution 1]. I'm waiting on a contract to sign there. I'm going from working Walter Reed for 15 years to being at Fort Bragg for 4 years, you know, working as a civilian. I'm pursuing being in the National Guard in Maryland, but I haven't pursued seriously." At the UC's request, Henry discussed the Ukrainian soldier he had seen training earlier at Fort Bragg.

The UC asked Henry about his clearances, and he responded, "I have just a regular standard security clearance." The UC asked if Henry could access "any type of, I guess, documents that you think might be of interest to support the cause?" Henry responded that he did not have access to classified documents, and discussed matters he claimed to have also relayed to the Ukrainian officer about medical tactics.

Henry then stated to the UC: "I can tell you every many, many weaknesses of military medicine in the United States. I have witnessed it first-hand. If you want weak points." Henry went on to detail that "there's like a central location that runs the entire network for the military healthcare system. . . I want to say somewhere in Illinois . . . . … Like if the network is down, you can't actually function as a doctor, as a nurse. It's insane."

9

The UC responded, "You've summarized it very nicely. So we are looking for something that will benefit us but also there's something that we can neutralize on the other end." Henry replied, "Germany, I know needs your gas. And Germany is also where the U. S. Military keeps their Walter Reed equivalent and, you know, in Landstuhl. Like they rely on the German government and supplies there in Germany . . . can't function without electricity, gas."

Henry told the UC that he had told the "Ukrainian doctor . . . I could provide medical care to either side and wouldn't feel any heartache." Gabrielian stated: "Every person that returns to combat is a person that lives another day to kill somebody else, and that somebody else is Russian. And by allowing these people to survive I'm officially killing my own [people]. At least some of them have kids."

The UC asked if Henry had been able to access "your systems" and Henry replied that he was having technical difficulties. Gabrielian responded: "I already described the way the system is structured, as long as we stay to neutral things, it doesn't flag us. If we ever access private health information or an important person, it'd flag us immediately. I think in your case if you climb too high, it will just remove your access instantaneously. Me, I'll just get called into the principal's office the next day and possibly fired."

The UC asked, "Out of curiosity. How high can you climb int that poll of importance for the personal records?" Henry responded that he had taken care of a family member of a very senior government official." Gabrielian began to discuss ultrasound technology to help determine if soldiers were fit to return to the field to fight, and other potential technologies to improve surgery.

The UC responded, "So obviously, as I told your wife before, we're not trying to, in any way, shape or form put you at risk, right? Or put you in a position where you sacrifice your whole life." Gabrielian responded to the UC: "If you have a useful long-term weapon, that can be used

for years. If you use it for something that's not tactically advantageous, you've lost it for nothing. So if [Henry] can't practice medicine, can't be in the National Guard, you've lost an Anny doctor. If I have to look somebody up, and I do look somebody up, you've lost a link to [my employer] to establish those medical connections. It has to be something massively important, not just check if this person has polyps."

The UC responded, "trust me, if we ever get to the point where they will perhaps have me pass you this type of request, it will be probably something that will be life changing, right?" Gabrielian replied, "And at that point I want my kids to have a nice flight to Turkey to go on vacation because I don't want to end up in jail here with my kids being held hostage as over my head."

Gabrielian then suggested to the UC that she record their conversation "Because memory is valuable and it's very useful to have the exact recording of what people said." The UC replied that would not help to build "trust and this relationship is building trust." Henry subsequently told the UC that he didn't want to know her name "cause I want plausible deniability too. Cause security clearance situation, they want to know, like names and people and all this stuff." Later on, Henry explained: "my point of view is until the United States actually declares war against Russia, Tm able to help as much as I want. At that point. I'll have some ethical issues I have to work through." Gabrielian replied: "you'll work through those ethical issues."

Henry told the UC that "Anna asked me to read *Inside the Aquarium*."[9] Gabrielian stated she had instructed HENRY to read the book, "Because it's the mentality of sacrificing everything . . . and loyalty in you from day one. That's not something you walked away from."

---

[9] The full title of the book is Victor Suvorov, "Inside the Aquarium: The Making of a fop Soviet Spy" (1986). The book describes the recruitment and training of a Russian spy inside the headquarters of the Main Intelligence Directorate of the then-Soviet Union (nicknamed "The Aquarium").

11

### iv. Meeting 4: August 24, 2022, at 7:50PM at the UC's Hotel Room in Baltimore

Gabrielian and the UC arranged to meet again in Baltimore on August 24, 2022. In that conversation, the UC again emphasized to Gabrielian that "everything depends on you. I mean, no one is forcing you. That is to say, if you—at some point—feel that, well, you're uncomfortable, we will just, like, shake hands and part ways"[10]

Gabrielian responded, "understand, because if people, well, came to you, and said, "I want to help," and then they ended up in an awkward situation, the stream of people who want to help would dry up very quickly."

The UC and Gabrielian discussed the international political situation concerning Russia, and the UC stated, "now that you said that you can—the two of you: you and he—um, get some kinds of medical, well, information about patients, right? And the higher the patient, the more, well, like, mechanism—" Gabrielian responded, "It gets checked." The UC responded, "[I]t seems to me that, as a test, they have asked me to have him, like, get some documents—medical information, or, well, the equivalent, probably of a medical card, like what we have. Um, for a few people—4 or 5 people—uh, at a level so that there will not, like, well, so the system doesn't kick him out, or whatever—so it doesn't expose the fact that he is checking. Would that be possible to do, or not?" Gabrielian responded, "Well theoretically yes," and explained that Henry was leaving for a conference the next day and returning on the 29th. Gabrielian then stated: "I will ask him. I mean, I will ask him if he can still take a look. But are there specific individuals or just general?" The UC responded, No, I think they just want to make sure that he has—well, that he really is a doctor in the army and that he has —like, access to [noise] information—well, patients, medical

---

[10] Unless otherwise noted, all quotes in this section are translated from Russian.

12

information—um, in the system, specifically of the army." Gabrielian responded, "Well, what I'm thinking is that maybe he can even access it from our home computer." Gabrielian also asked the UC, "If it does fall, then the access falls; or if he tells me, "Anna, after all, this is a HIPAA—" that is, a privacy act, "—violation,"—then what happens to him? Does he get filtered out as a candidate?" The UC replied: "I honestly don't know. It will all depend, line on his answer, right?" Gabrielian and the UC continued to discuss the logistics of how Henry could access medical records without drawing the attention of anyone in the Army.

  v. <u>Meeting 5: August 31, 2022, Meeting at the UC's Hotel Room in Gaithersburg.</u>

On August 25, 2022, Gabrielian sent a text to the UC using coded language, advising him that Henry would provide Army medical records: "Jamie might have samples of his poetry laying around. He says he will look for them and decide if he has the bandwidth for another project over the weekend. I think it would be good for him to at least show you examples of his past work."

On August 31, 2022, the UC, Henry, and Gabrielian met at a hotel in Gaithersburg. As outlined in the Indictment, Gabrielian provided the UC with health information related to N.Z., the spouse of a currently employee at the Office of Naval Intelligence and A.R., a veteran of the U.S. Air Force. Gabrielian highlighted to the U.C. a medical issue reflected in the records of N.Z. that Russia could exploit.

During that same meeting, Henry provided the UC with medical information related to at least five individual who were patients at Fort Bragg, including a current DOD employee, a current member of the military, the spouse of an Army veteran, and a retired arm officer.

The defendants were indicted by the Grand Jury on September 28, 2022 with Conspiracy to Violate HIPAA in violation of 18 U.S.C. § 371 and Disclosure of Individually Identifiable Health Information, in violation of 42 U.S.C. § 1320d-6.

13

They were arrested the next day.

**2. Legal Standard**

"Entrapment is designed to prevent the conviction of the 'unwary innocent' induced by government action to commit a crime. It does not, however, protect the 'unwary criminal.'" *United States v. Skarie,* 971 F.2d 317, 320 (9th Cir. 1992) (citation omitted). While the ultimate question of entrapment is one for the jury, in order to assert an affirmative defense at trial, the defendant must proffer sufficient evidence for a reasonable jury to find in favor of the defendant. *Mathews v. United States*, 485 U.S. 58, 63 (1988). Failure to proffer sufficient evidence in advance of trial to satisfy each element of an affirmative defense requires the preclusion of the submission of any such evidence at trial. *United States v. Brebner*, 951 F.2d 1017, 1023-25 (9th Cir. 1991) (granting the government's motion, on second day of trial, to preclude defendant and defense witnesses from testifying in support of an entrapment by estoppel defense, where proffered evidence failed to meet the requirements of the defense).

To assert the defense of entrapment, the defendant must show: (1) that the government induced him to commit the crime; and (2) that he was not predisposed to commit the crime. *United States v. McLaurin*, 764 F.3d 372, 380 (4th Cir. 2014); *United States v. Thickstun*, 110 F.3d 1394, 1396 (9th Cir. 1997). The government induces a crime when it creates a special incentive for the defendant to commit the crime. Inducement is "any government conduct creating a substantial risk that an otherwise law abiding citizen would commit an offense." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 648 (9th Cir. 2006) (citations omitted). The mere fact that the government afforded opportunities or facilities for the commission of the offense, however, is insufficient to show inducement: "Artifice, stratagem, pretense, or deceit may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932).

"[S]olicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime." *United States v. DeVore*, 423 F.2d 1069, 1071 (4th Cir. 1970), cert. denied, 402 U.S. 950 (1971).

Once the defendant has shown government inducement, the burden shifts to the government to prove beyond a reasonable doubt the defendant's predisposition to have engaged in the criminal conduct. *United States v. Jones*, 976 F.2d 176, 179 (4th Cir. 1992). Predisposition "focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L. Ed. 2d 54 (1988).

### 3. The Government Did Not Induce the Defendants to Commit the Offense

There is no evidence in this case that the Government induced either Defendant to commit the offenses. "[M]ere solicitation is not enough to show entrapment." *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 n.10 (citations omitted). And in this case, there was not even solicitation – it was Gabrielian who first reached out to the Russian embassy offering that she and her military officer spouse husband were "ready to help if there is a need." When she was approached by the UC (who Gabrielian believed had been sent by the Russian Embassy), Gabrielian stated that she wanted to be the "best and biggest help to you." The UC specifically did *not* suggest any activity to Gabrielian, instead stating, "But when you said that your husband and you were ready to help, did you have any specific idea? May be, you were hinting at something?" Gabrielian responded, "I am hinting that if my husband and I are in the position, in which we could *do anything to help in any way*, we would do it. I mean my hint was, well, taken correctly. We… I am also not an expert in this field. That is, it's not like I go and know what to offer . . . I mean I am offering help, but I do not know what exactly."

15

The UC asked: "And would this help only apply to the medical field or also to some other ones, well, because…" Gabrielian responded: "Other one that would be necessary. If they are needed." The UC responded: "Because Medical field is good, but we are currently focused so much on…" Gabrielian interjected: "other ones." The UC stated: "Other ones…On other things, right? So, help in that specific area would be invaluable. That is, any such, well not really insight, but any, like, support in this regard… if you husband had any access…" Gabrielian responded that her husband would tell the UC "absolutely everything that he knows."

In other words, Gabrielian suggested that she and her husband would provide any useful and helpful information to an Agent of the Russian government. What's more, it was Gabrielian who first brought up medical information and proposed accessed medical charts to the UC at their second meeting. And she was the one who suggested doing so to Henry. In other words, the Government neither solicited the information, nor placed any pressure on Gabrielian. That is far from below what a defendant must show to assert the inducement prong of an entrapment defense. A defendant "must offer more than a scintilla of evidence of solicitation, plus 'actual persuasion or other pressure by the government.'" *United States v. You-Tsai Hsu*, 364 F.3d 192, 199 (4th Cir. 2004). The Fourth Circuit has been clear that inducement is "defined as solicitation plus some overreaching or improper conduct on the part of the government." *Id.* at 200. There is no indication here of anything approached "overreaching" or "improper conduct." Indeed, the UC emphasized to Gabrielian in the August 24 meeting that, "everything depends on you. I mean, no one is forcing you. That is to say, if you—at some point—feel that, well, you're uncomfortable, we will just, like, shake hands and part ways."

Far from being persuaded (or even solicited) by the UC, it was Gabrielian who came up with the scheme to provide medical records to the Russian government. Indeed, she told the UC

16

she was a "useful long-term weapon, that can be used for years. . . If I have to look somebody up, and I do look somebody up, you've lost a link to [medical institution 1] to establish those medical connections. It has to be something massively important, not just check if this person has polyps." In other words, Gabrielian viewed herself – and her medical position and access to records – as a 'useful long-term weapon that can be used for years" for the Russian Government.

The Fourth Circuit has stated that there was no entrapment defense when a cooperator called defendants *over thirty times* to "suggest" they "acquire cocaine for [him] before they acquiesced." *Velasquez*, 802 F.3d at 106. Here the Defendant suggested transferring the medical records at the first opportunity to the UC, and then recruited her husband to do so (without any government action at all effecting Henry). Moreover, the Defendant was clear as to what she considered herself: a "useful long-term weapon" for Russia. There was no inducement for either party.

### 4. The Defendants Were Predisposed to Commit the Offense

The Defendant's not only suggested committing the offense, they showed no hesitation in carrying it out, and arranged to meet with the UC to transfer IIHI for specific persons. They did so in order to show their potential effectiveness to a person they believed to be sent by the Russian Embassy. And they were clear on their motives for doing so: Gabrielian acted for a "love" of Russia. Henry acted because he hated war and believed the United States actions supporting Ukraine and other foreign activities were wrong. If there was any question about predisposition, it is answered by the fact that Gabrielian (prior to any meeting with the UC) had her husband read a book about the recruitment techniques of the Soviet Spy Agencies so that (in her words), he could understand, "The mentality of sacrificing everything . . . and loyalty in you from day one. That's not something you walked away from."

17

"Predisposition," refers to "the defendant's state of mind before government agents make any suggestion that he shall commit a crime," *United States v. Osborne*, 935 F.2d 32, 37 (4th Cir. 1991); the government does not entrap a defendant, even if he does not specifically contemplate the criminal conduct prior to this "suggestion," if "his decision to commit the crime is the product of his own preference and not the product of government persuasion. *Id. at 38*.

Generally., entrapment is a jury question. *Matthews,* 485 U.S. at 62. But that is not always the case. The Defendant bears the "initial burden" of production. a "court may find as a matter of law that no entrapment existed, when there is no evidence in the record that, if believed by the jury, would show that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready and willing to commit it." *United States v. Osborne*, 935 F.2d 32,38 (4th Cir. 1991). There is no evidence in the record to indicate any risk that the defendants were anything but ready and willing: the defendants were clearly predisposed to commit the crime that was of their own creation. And they were the ones who had reached out to the Russian Embassy in the first place, and suggested the crime to the Undercover Agent. Before even meeting the agent, Gabrielian had instructed her husband to read a book about Soviet spy recruitment so that he could understand "the mentality of sacrificing everything." The Defendants were acutely predisposed to commit the offense.

## CONCLUSION

The Defendants cannot meet their burden given the evidence regarding an entrapment defense, and therefore should be precluding from referring to an entrapment defense in their opening argument.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Aaron S.J. Zelinsky
P. Michael Cunningham
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day, a copy of the foregoing motion was electronically filed via CM/ECF which provides notice to counsel of record.

_____/s/_____
Aaron S.J. Zelinsky
Assistant United States Attorney