**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.  SAG-22-336** |
| | * | |
| **ANNA GABRIELIAN &** | * | |
| **JAMIE LEE HENRY,** | * | |
| | * | |
| **Defendants.** | * | |
| | ****** | |

**GOVERNMENT'S CONSENT MOTION FOR PROTECTIVE ORDER PERTAINING**
**TO TESTIMONY OF UNDERCOVER AGENT AT TRIAL**

The United States of America moves for an Order Pertaining to Testimony of Undercover Agent at Trial. The government seeks a protective order with the following provisions in order to protect the identity of an FBI undercover employee ("UCE") who is expected to testify at trial. These protections are necessary in order to protect the safety of the UCE and the UCE's family, and to preserve the ability of the UCE to continue work in an undercover capacity in ongoing and future investigations. In support of this motion, the government submits the following:

**RELEVANT FACTS**

Defendants Anna Gabrielian and Jamie Lee Henry are each charged in an Indictment with one count of conspiracy to wrongfully disclose Individually Identifiable Health Information (IIHI) to an individual they believed to be a representative of the Russian government in violation of  18 U.S.C. § 371. ECF 1.  Defendant Gabrielian is charged in Counts 2 and 3 with Wrongful Disclosure of IIHI in violation of 42 U.S.C. 1320d-6; Defendant Henry is charged in Counts 4-8 with the same offense.  At the time of these offenses, Gabrielian was an anesthesiologist at Medical Institution 1 and Henry was a Major in the United States Army, working as a doctor. Henry possessed a Secret-level security clearance.

As part of the investigation that resulted in the charges against the defendant, an FBI undercover agent ("UCE") was used. The UCE communicated in person and via text message with Gabrielian and Henry between in August 2022.  During these communications, Gabrielian and Henry discussed the need for "plausible deniability" and discussed cover stories the UC could give regarding their meetings. Ultimately, Gabrielian and Henry provided the UCE with IIHI related to patients at Medical Institution 1 and Fort Bragg.

At trial, the defense has indicated it intends to call the UCE as a witness to testify to the UCE's communications with Gabrielian and Henry.[1]

The UCE continues to work in an undercover capacity.

The UCE's ability to continue to work in an undercover capacity and the UCE's safety would be jeopardized by the disclosure of the UCE's true identity or physical appearance.

Counsel for Defendant Gabrielian and Defendant Henry have stated they consent to this motion.

**PROTECTIVE MEASURES SOUGHT**

Based upon the need to protect from disclosure the UCE's true identity and physical characteristics, and the need to protect other undercover investigations and the government's undercover investigative procedures, the government respectfully submits that there are certain measures the Court may and should adopt for the testimony of the UCE at trial. As set forth more fully below, the proposed security measures are narrowly tailored to assure that the identity and security of the UCE and the integrity of other undercover investigations will not be compromised by the UCE's appearance as a witness at trial, without impairing the defendant's fair trial rights

---

[1] The Government has not determined at this time if it will call the UCE, but reserves the right to do so.

under the Sixth Amendment. Specifically, the government requests the Court implement the following measures:

1. The UCE may testify under the UCE's undercover pseudonym when testifying at trial, without disclosing publicly the true identity of the UCE;

2. The defense shall be prohibited from asking any questions seeking personal identifying information from the UCE;

3. The UCE may testify using a light disguise, such as changing the UCE's facial hair, hairstyle, or dress style;

4. When the UCE testifies, only the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team shall be present in the courtroom. The government shall provide a contemporaneous audio broadcast of the courtroom proceeding while the UCE is testifying for the public in a separate room.

5. No public disclosure of any audio or video recording, or similar reproduction of the voice or visual image of the UCEs while testifying, shall be permitted.

6. The UCE shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom, shall be permitted to enter the courtroom and sit in the witness chair outside the presence of the jury and defendant, and shall be permitted to remain seated when sworn in;

7. All non-official recording devices shall be prohibited from being in the courtroom in which the UCE testifies as well as the room in which the audio feed is broadcast during the UCE's testimony.  Defense Counsel will be permitted to retain computers but are prohibited from recording.

8. The Protective Order sought by this motion may only be modified through a written superseding order issued by this Court.

**ARGUMENT**

The most drastic step used to protect the identity of undercover officers would be the closing of the court proceedings to the public during trial. The government is not seeking to close the proceedings but is seeking a series of reasonable measures to prevent the public disclosure of the true identity and physical description of the UCE.  Based upon the standards set forth below, putting in place these reasonable alternative measures to closing the proceedings is supported by the law and is an appropriate balance of the defendant's rights to a public trial and confrontation, and the interests of the FBI in not jeopardizing the UCE's continuing undercover work or safety. Analysis of the impact of these measures on the defendant's rights to a public trial and to confrontation follows.

    A.  **Right to a Public Trial**

The Sixth Amendment guarantees the right to a public trial. *See* U.S. Const. Amend. VI. The right to a public trial assures the defendant receives a fair trial, promotes the integrity of the fact-finding process, preserves public confidence in the criminal justice system, and affords the community an outlet to address crime. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984). However, the Supreme Court has recognized the right to a public trial is not absolute and under certain circumstances, trial courts may implement reasonable trial procedures to protect other compelling interests, without violating the Sixth Amendment. *Id*. At 45. In *Waller* the Supreme Court discussed four factors for a court to determine if closing proceedings are justified:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller,* 467 U.S. at 48. The Fourth has adopted a modified *Waller* test to use when evaluating partial courtroom closures (when some but not all spectators are barred from the

proceedings), the only modification being that "overriding interest" is replaced by requiring a showing of a "substantial reason." *United States v. Barronette*, 46 F. 4th 177, 193 (4th Cir. 2022).

Here instead of seeking a full or partial closure of the proceedings that bars spectators from live proceedings, the government seeks approval of measures to protect the UCE's identity, while providing spectators an alternative means of attending the trial. Although the government is not seeking to close the proceedings, the modified *Waller* analysis is instructive and should guide the Court's decision.

### i) Substantial Reason

The government's interest at stake in this case is in protecting the safety and effectiveness of the UCE. As the Second Circuit has recognized, "The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and . . . this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom. *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997); *see also Rodriguez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008) ("It is clear that the State has an 'overriding interest' in protecting the identity of its undercover officers."). In *Ayala*, the Second Circuit further explained:

> The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and the trial judge in each case was amply justified in concluding that this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom. There is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity. Of course, the defendant himself has an opportunity to observe the officer (a second opportunity, if the defendant is guilty), and might communicate a description of the officer to others, particularly if the defendant is at liberty pending trial. The defendant's right of presence at his trial requires accepting that risk, but the right to a public trial does not require the further risk that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying.

*Ayala*, 131 F.3d at 72. Similarly, protecting the safety of witnesses generally is also considered to be a substantial reason in this context. *See Simmons*, 797 F.3d at 414 ("In particular, courts have consistently held that ensuring witness safety and preventing intimidation constitutes a substantial reason to justify the partial closure of the courtroom.").

The facts of this case support finding that the government has a substantial reason for the proposed measures. The defendants are alleged to have contacted the Russian Embassy offering their assistance, and subsequently been approached by the UC, whom they believed to be an agent of the Russian Embassy.

Although there are no specific threats against the UCE, there is a legitimate risk that individuals associated with the Russian Government are actively seeking to identify law enforcement offices and share that information with others. Protecting the UCE in this case is a "substantial reason" for the requested measures.

### ii) No Broader Than Necessary

The measures sought by the government are no broader than necessary. The proposed measures will provide a means by which the public may hear live testimony. Requiring nonessential personnel to listen to testimony from a separate room where they cannot physically see the UCE is the least restrictive measure that assures the safety of the UCE. More restrictive measures, such as closing the proceedings to spectators during the testimony of undercover officers, without providing a separate room where the public could hear live testimony, have been approved in other cases where the public could only access a transcript after the testimony. *See Ayala*, 131 F.3d at 72 (approving partial closure of court for testimony of undercover officer where the transcript of testimony was available to the public and press); *United States v. Hernandez*, No. S1 12 Cr. 809 (PKC), 2013Wl3936185 at *2 (S.D.N.Y., Jul. 29, 2013) (approving closure of court

to public during testimony of undercover officer where government agreed to make the transcript of the testimony available at the end of the trial day). Here, the government proposal allows the public to hear live testimony, in addition to having access to the public transcript. The proposal is also limited as it only applies to the one witness. *See Carson v. Fischer*, 421 F.3d 83, 90 (2nd Cir. 2005) (when evaluating whether a partial court closure was no broader than necessary, noting that "it is important that the closure occurred only during a single witness testimony").

These measures are especially appropriate in this case. The UCE in question did not actually meet the defendant in person and is not depicted in any relevant photographs or videos that will be submitted as evidence at trial. There is no legitimate public interest in the UCE's physical appearance in a case. The content of the UCE's testimony is what's important, not the UCE's physical appearance.

### iii) Reasonable Alternatives

In evaluating the third prong, the trial court must consider reasonable alternatives to closing the proceeding [].]" *Waller*, 467 U.S. at 48. Here, the alternatives open to the Court do not provide the same balance of the competing interests. For example, the public could remain in the courtroom while the UCE testified behind a screen or barrier. See *United States v. Lucas* 932 F.2d 1210 (8th Cir. 1991) (use of screen at trial to shield testimony of undercover police officer from public permitted). A screen would have essentially the same effect as the government's proposed option—the spectators would be able to hear, but not see the testifying UCE. However, this option is not as practical and raises other concerns. Any screen or barrier would have to allow for the Court, the jury and the defendant to see the UCE. The jury has to be able to evaluate the UCE's credibility and part of the defendant's right to confront the witnesses against him includes the right to see those witnesses. *See Carson v. Fischer*, 421 F.3d at 90 (noting that a curtain, like a disguise,

"would have impaired the jury's ability to see the witness and assess his credibility"). The location of the jury box, witness chair, counsel table, and bench makes such a screen difficult without making major changes to the layout of the courtroom.2 Such changes to layout could impair the ability of the Court Security Officers to do their job in the courtroom, or draw undue attention to the UCE by the jury, making the jury believe that the UCE was a "special" witness deserving of extra credibility. There is also no guarantee that a spectator might not have an unanticipated viewing angle that would accidentally allow the spectator to see the UCE.

A more extensive disguise is also not an effective balancing of the interests in this case. Although the public would be able to both see the UCE and hear the UCE's testimony, the effect of an extensive disguise could be prejudicial to the defendant, as it could hinder the ability of the jury to evaluate credibility and draw undue attention to the "unique nature" of the UCE's testimony. Further, such an extensive disguise would not fully protect the UCE's physical description from the public, as spectators might still see the physical dimensions of the UCE.

### iv) Adequate Findings

Under the foregoing principles, the proposed measures requested by the government to protect the security and safety of the UCE, and to protect the integrity of other undercover investigations, would not violate the defendant's Sixth Amendment rights. The government in this case is not seeking the drastic measure of closing the court during the testimony of the UCE. The government only seeks to protect from disclosure the true identity of the UCE. To accomplish that goal the government has proposed reasonable procedures short of closing the proceedings that will not interfere with the defendant's Sixth Amendment rights and will allow the public to hear the testimony of the UCEs in real time.

Should individuals outside of those addressed above thers learn of the UCE's true identity, it would also compromise future investigations that might involve the UCE, as individuals associated with the Russian Embassy or others could apply what they learn about this UCE to other situations in which they suspect an undercover officer is present.

While the government is not aware of any particular individual who might attend the proceedings during the UCE's testimony who would pose a threat, there is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity.@ *Ayala*, 131 F.3d at 72. The risk that anyone in the courtroom might recognize either the UCE or reveal the appearance of the UCE to others would create a personal danger to the UCE and would run the risk of jeopardizing ongoing FBI investigations.

Balanced against these concerns, the contemporaneous audio broadcast of the proceedings to the public in a separate room provides the public with access to the trial proceeding, except for the ability to view the UCE's physical appearance. As noted above, courts have approved the full closure of courts for testimony of undercover agents and have approved use of screens which prevent the public from viewing the testifying witness. The government's request is consistent with these cases. A similar request to the government's was in the District of Oregon. In *United States v. Mohamud*, the district court granted a protective order that requested use of a separate room for CCTV broadcast of undercover agents' testimony in a manner that prevented the public from viewing the witness. That case actually presented even more difficulties because the evidence included video and photographs of the undercover agents. *United States v. Mohamad*, No. 3:10-CR-00475-KI, Doc. 341 (D.Or., Dec. 19, 2012) (attached as Exhibit 2).

**B. Right to Confront Witnesses**

The government's proposed measures also comply with the confrontation clause. The confrontation clause of the Sixth Amendment provides the defendant in a criminal trial has the right to confront and cross-examine the government's witnesses who testify against the defendant. See U.S. Cont. Amend. VI; *Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129 (1968). The elements of confrontation - physical presence, oath, cross examination, and observation of demeanor by the trier of fact - serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings. *Maryland v. Craig,* 497 U.S. at 846. As explained below, the proposed measures do not violate the confrontation clause.

### i) Use of Separate Room to Hear Testimony

The use of a separate room for spectators to hear testimony complies with the confrontation clause because the defendant will remain in the courtroom to both hear and see the UCE's testimony against him and will have an unobstructed view.

### ii) Use of Pseudonym

The proposed use of a pseudonym by the UCE also does not violate the confrontation clause. In *Smith v. Illinois*, 390 U.S. 129 (1968), the Supreme Court found that preventing the defense from learning the real name of a government informant, the principal prosecution witness, on cross-examination violated the defendant's Sixth Amendment right to confrontation. *Id.*, at 130-133. However, *Smith* did not set out a definitive rule that the Sixth Amendment requires that the real names of government witnesses always be disclosed. As the First Circuit has explained,

> Against this backdrop, it is readily apparent that all pseudonyms are not equal in the eyes of the Confrontation Clause. Rather, courts must gauge the pull of *Smith* in any given case by the degree to which its rationale applies. Sometimes, as in *Smith* itself, a witness's use of a fictitious name will transform him into a wraith and thereby thwart the efficacy of cross-examination. Other times, the use

of a fictitious name will be no more than a mere curiosity, possessing no constitutional significance.

*Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992). Instead of a fixed rule, there should be a "balancing of interests in the relevant case-specific context." *United States v. Cellis*, 608 F.3d 818, 833 (D.C. Cir. 2010). *See also United States v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011).

Here that balancing of interests favors permitting the UCE to testify using a pseudonym. The defendant in this case never knew the true name of the UCE. The true name of the UCE is irrelevant to the expected testimony. Cross-examination is not hindered through use of a pseudonym in this case. The government will also provide defense counsel with any known *Giglio*/impeachment information and Jencks Act statements for the UCE. Several courts have approved testimony by a witness using a pseudonym, finding that the government's interest in protecting the witness from harm outweighs any interest the defendant may have in learning the true name of the witness. *See Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (noting that undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name); *Siegfriedt v. Fair*, 982 F2d 14, 18 (1st Cir. 1992); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (finding that where there is a threat to the life of the witness the right of the defendant to have the witness's true name, address and place of employment is not absolute.) *United States v. Rangel*, 534 F2d 147 (9th Cir. 1976) (holding that where record showed that witness's life had been threatened and witness and family relocated, no error in permitting witness to testify without divulging true name, address and phone number); *United States v. Ellis*, 468 F2d 638 (9th Cir. 1972) (affirming decisions to prohibit cross-examination on undercover agent's name and address where there were a substantial reasons for

withholding the information and the witness testimony was of marginal significance). Therefore, use of a pseudonym by the UCE in this case should be permitted.

### iii) Light Disguise

Use of a light disguise also will not affect the defendant's right to confrontation and cross-examination. Because no video evidence in this case shows the UC's physical appearance, the UCE's physical appearance is not at issue, and there is also no issue of physical identification of the UCE in the evidence for the jury to consider The jury will likely never know the UCE's appearance has been changed. And should the disguise be apparent, the Court has the option of providing an instruction to the jury, explaining in a neutral way why the UCE is in disguise. The light disguise will not be so extensive that the jury is unable to evaluate the demeanor of the UCE while testifying.

"[C]ourts should consider whether the disguise furthers an important state interest and whether the reliability of the evidence could be otherwise assured." *United States v. de Jesus Castaneda,* 705 F.3d 1117, 1120 (9th Cir. 2013). Here the important state interest is the security and continued effectiveness of the UCE, and the UCE's physical appearance has no impact on the reliability of the evidence because the UCE will still be subject to the four elements of confrontation identified in *Maryland v. Craig*—"physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." *Maryland v. Craig*, 497 U.S. at 846.

### iv) Limits on Cross-Examination

The government seeks a protective order limiting the ability of the defense to reveal personally identifying information during cross-examination. The right to cross-examine witnesses does not require questioning on all topics without limit. The rule is that once cross-examination reveals sufficient information to appraise the witness's veracity, confrontation demands are

satisfied. *United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983). There is no absolute right of an accused to have a jury hear a witness's true name and address. *United States v. Cosby*, 500 F2d 405, 407 (9th Cir. 1974); *United States v. Rangel*, 534 F2d 147 (9th Cir. 1976); *Palermo*, 410 F.2d at 472. This restriction of cross examination for the witness's protection was recognized in the Supreme Court in *Delaware v. Van Arsdall*, noting that Atrial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness safety, or interrogation that is repetitive or only marginally relevant. *Deleware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Here, inquiry into personally identifying information of the UCE is not necessary to vindicate the defendant's right to confrontation. Such information is not relevant to the testimony of the UCE and will not affect the UCE's credibility. Such inquiry would be of little or no value in circumstances such as these, where the UCE's interactions with the defendant were all through social media. Further, the government will provide all required *Giglio*/impeachment information about the UCE, allowing any cross-examination into those topics by defense counsel.

### *v) Other Measures*

The other measures requested by the government—that the UCE be permitted to enter the courtroom by a separate entrance outside the presence of the jury, spectators, or the defendant; that the UCE be permitted to be sworn in while sitting; that there be no audio or video recording; and that recording devices be prohibited—are all reasonable, necessary measures that do not conflict with the defendant's right to confrontation.

**CONCLUSION**

For all the foregoing reasons, the government respectfully requests that the Court grant the government's motion for a protective order and adopt the government's proposed protective measures to assure the security and safety of the UCEs, other undercover investigations, and the government's undercover investigative procedures. As explained above, the measures requested by the government do not violate the defendant's right to a public trial or his right to confront the witnesses against him. These measures are a reasonable balance of the defendant's rights and the government's interest in protecting the UCE's identity.

The Court should make the following findings based on the law and the information presented in this motion:

1) The reasonable alternative measures proposed by the government are necessary to protect from disclosure the true identity of the UCE at trial;

2) Disclosure of the UCE's true identity would jeopardize ongoing undercover investigations of which they were or are currently involved in;

3) The UCE has a real and substantial risk of danger to themselves and their families if the UCE's true identity is disclosed;

4) Disclosure of the true identity of the UCE could disclose the government's undercover investigative procedures, which could compromise other, ongoing undercover operations if disclosed.

A proposed Order is attached.

Respectfully submitted,

Erek L. Barron
United States Attorney

By:    _____/s/_____

Aaron S.J. Zelinsky
P. Michael Cunningham
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this day, a copy of the foregoing motion was electronically

filed via CM/ECF which provides notice to counsel of record.

_____/s/_____
Aaron S.J. Zelinsky
Assistant United States Attorney