IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.  SAG-22-336 |
| | * | |
| ANNA GABRIELIAN & | * | |
| JAMIE LEE HENRY, | * | |
| | * | |
| Defendants. | * | |
| | ******* | |

**GOVERNMENT'S BRIEFING REGARDING INSTRUCTION NO. 31:
"MALICIOUS HARM" AND "PERSONAL GAIN"**

The Government submits this supplemental briefing regarding proposed Jury Instruction No. 31, concerning the elements of 42 U.S.C. § 1320d-6.  The Government proposes that the term "malicious harm" is self-explanatory and does not need additional definition, as a previous District Court has held.  But if additional definition is necessary, then the jury should be instructed consistent with Sand & Siffert's pattern instruction on malicious intent, "to act either intentionally or with willful disregard of the likelihood that harm will result, and not mistakenly or carelessly." The Court should also not limit the harm to the individual whose record is transferred.

As for "personal gain," the Government proposes the definition, "'for personal gain' means an action is done to gain a substantial advantage or to rid oneself of substantial difficulty.  Personal gain need not be monetary and can include a reputational benefit."  This definition squares with the structure of the HIPAA statute, its purpose, and the Supreme Court's definition of personal gain approved in the related context of insider-trading law.

1. **Statutory Background**

The Defendants are charged in Count 1 with conspiracy in violation of 18 U.S.C. § 371; the substantive offense underlying this conspiracy count is 42 U.S.C. § 1320d-6, the wrongful

disclosure of individually identifiable health information (IIHI).  Dr. Gabrielian is also charged with two substantive counts of violating § 1320d-6 (Counts Two-Three), and Dr. Henry is charged with six substantive violations of the same (Counts Four-Nine).

> 42 U.S.C. § 1320d-6(b)(3) provides, in relevant part:
>
> if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, *personal gain, or malicious harm*, [the defendant shall] be fined not more than $250,000, imprisoned not more than 10 years, or both.

(emphasis added).  The Government and the Defendant disagree regrading what instructions should be provided to the jury related to "malicious harm" and "personal gain."

### 2. Malicious Harm

As an initial matter, the Government believes that the jury can be instructed that the fourth element of the HIPAA violation includes the need to act "for malicious harm," without further definition. Neither "malicious" nor "harm" are terms of art or defined elsewhere in the statute or code.  Both are straightforward and can be easily understood by the jury.  Indeed, in *United States v. Laulu*, 13-CR-0092 (D. Alaska, 2015), ECF 33, at 28-29, the District Court instructed that the fourth element requires "malicious harm," without further definition.  Such an instruction is the most straightforward way to resolve the issue.

The Defendant has previously argued that "malicious harm" is limited to the *"individual patient* whose health information is transferred" ECF 60-1, at 10. (emphasis added). But, the plain reading of the statue cuts the other way.  Congress is well aware how to write such limiting phrases when it wants to, but chose not to do so here. *Cf.* 18 U.S.C. § 2326 (enhancing the penalties for violations of 42 U.S.C. § 1320a-7b for any individual who "targeted persons *over the age of 55*") (emphasis added); 18 U.S.C. § 115(a)(1)(B) (enhancing the penalty when an individual threatens certain officials "with intent to impede, intimidate, or interfere *with such official*") (emphasis

added). Here "malicious harm" provides the motive, but the "malicious harm" may be directed at other entities beside the particular individual whose record is disclosed. Congress did *not* write "malicious harm toward the individual patient whose health information is transferred," as the Defendant would re-write the statute via instruction. Indeed, there is no textual indication the clause "malicious harm" was meant to be so limited. It was meant to cover "malicious harm" regardless of the target of such malice.

The structure of the statute further supports this reading, because the two clauses that precede "malicious harm" – "commercial advantage" and "personal gain," – have no relation to the individual patient whose health information is transferred whatsoever. In other words, those two clauses relate to the mental state of the defendant, not the effect on the individual record holder. They merely provide the motive for the crime. The Defendant need to receive a "commercial advantage" over the "individual patient whose health information is transferred" or a "personal gain" from the "individual patient whose health information is transferred." There is no indication that "malicious harm" alone in the sequence should be so limited. Holding otherwise would violate the canon of noscitur a sociis – "a word is known by the company it keeps." *Jereki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

Moreover, the Defendant's theory that the harm must be focused only on the individual patient who owns the record was transferred sweeps far too broad and leads to absurd results.

First, a single patient's record may contain IIHI of more than just that patient. Consider, for example, a defendant who leaks the patient file of a child in order to provide information about an inherited health condition from a parent contained in the file, so the parent can be extorted. Or a defendant who leaks health information about a child's expensive medical condition so a parent can be approached by a foreign intelligence agency offering a bribe. Under the Defendants' theory,

neither would qualify as "malicious harm," since it is the parent, not the child-patient, who is being extorted or targeted for compromise.  Certainly, the protections of HIPAA were not meant to turn on the particular technicality of whose name appears at the top of the chart.

Second, the IIHI of one person may be used to maliciously harm others, or for more generalized malicious harm.  Consider, in the most extreme example, the medical records of the President of the United States.  Public reports state that "Foreign intelligence agencies invest heavily in the ability to collect sensitive medical information about world leaders, seeking to place sources where they would have direct or indirect access to these discussions[.]"  Lara Seligman, *The World's Hottest Spy Target: Trump's Health*, October 5, 2020, available at https://www.politico.com/news/2020/10/05/hottest-spy-trump-health-426577.  Surely, when foreign adversaries attempt to obtain such information, they are doing so for malicious harm – but not to the "i*ndividual patient* whose health information is transferred" – the President of the United States – but to the Country more broadly.  The same article quotes a former CIA senior intelligence service officer who retired in 2019:

> It was often feasible to collect information on the health of our adversaries' leadership, as the targets for recruitment were not the other country's intelligence service or even government personnel, but rather *hospital or administrative staff* — targets that would not have the counterintelligence antenna up.

*Id.* emphasis added.  Such information, the article notes, could be used to "to make mischief and sow doubt about the stability of the U.S. government."  *Id.*

Indeed, a hostile foreign power using a doctor to provide information on the health of the President is not merely idle speculation. *It is precisely what Dr. Gabrielian discussed in this very case.* In the first hotel meeting with the Undercover Agent on August 17, 2022, Dr. Gabrielian told her: "[I]t's the same with Jamie. That is to say, the president could be going to the hospital where he worked, [Walter] Reed,— —and Jamie has that kind of access, but he could look at [the

4

President's medical record] one time, and then that would be it." Later in the conversation, the UC asked Dr. Gabrielian: "Well, just out of curiosity, to what level can someone have this [medical record] access, with regard to political figures?" Gabrielian responded, "I'll have to ask, because . . . I don't know whether he can open the chart of the president, -- or not." In a later conversation with the Undercover Agent, Dr. Henry boasted that he had cared for various "VIPs" when he was previously stationed at Walter Reed, and spoke about how then-President Trump was treated there as well.[1]

If conspiring to provide the President's health records to a hostile foreign power is not an example of action being done "for malicious harm," it is difficult to see what might fit the bill, even if there was no direct harm intended to the President himself.[2] Compromising the security of the nation by providing sensitive medical information of the President is clearly done for "malicious harm," even if the harm is generalized.

If the Court decides that the term "malicious harm" needs further definition, Sand & Siffert provide a relevant pattern instruction. 18 U.S.C. 844(f) provides a penalty for "whoever *maliciously damages or destroys*, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States." The Pattern Jury Instruction defines "maliciously damages" as:

> To act with malicious intent means to act either intentionally or with willful disregard of the likelihood that damage will result, and not mistakenly or carelessly. In order to find the defendant guilty you must find that the defendant set the fire

---

[1] Ironically the article cited above noted that "[The former CIA station chief in Moscow] expressed skepticism that adversaries *like Russia and China could have spies inside Walter Reed Medical Center*." *See* Lara Seligman, *The World's Hottest Spy Target: Trump's Health, October 5, 2020, available at* https://www.politico.com/news/2020/10/05/hottest-spy-trump-health-426577 (emphasis added).
[2] Additional examples of potential malicious harm to third parties via wrongful medical disclosures are provided at ECF 60, Att. 1, at n.1.

with the intent to cause damage (or harm), or that he did so recklessly and without regard to the likelihood that such damage (or harm) would result.

Sand & Siffert, Modern Federal Jury Criminal Instructions, 30-5, *Third Element – Malicious Intent.* An analogous instruction here "for malicious harm" would read:

To act for malicious harm means to act either intentionally or with willful disregard of the likelihood that harm will result, and not mistakenly or carelessly. In order to find the defendant guilty you must find that the defendant transferred the IIHI with the intent to cause harm, or that she/they did so recklessly and without regard to the likelihood that such harm would result.

As discussed above, the Government does not believe that such an instruction is necessary, given the straightforward nature of the term "malicious harm." But if such an instruction is required, then Sand & Siffert provide the relevant guidance.

3. **Personal Gain**

The Government proposes that "personal gain" be defined as "an action is done to gain a substantial advantage or to rid oneself of substantial difficulty." And that the Court note that, "personal gain need not be monetary and can include a reputational benefit."

When the Congress seeks to limit "personal gain" to the purely monetary, it clearly knows how to do so. For example, 8 U.S.C. 1182(a)(3)(B)(iii) defines terrorist activity to include "(b) explosive, firearm, or other weapon or dangerous device (other than for *mere personal monetary gain)*" (emphasis added). And the Supreme Court has noted that "personal gain" is not limited to the purely monetary in other contexts. *See Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 61, n.3 ("defendants were compelled by motives of personal gain, namely self-interest and political motivations."); *Dirks v. SEC*, 463 U.S. 646, 676 n. 13 (1983) (Blackmun J., dissenting) (noting that the Court's majority holds that giving "gifts involve personal gain"; *Id.* at 663-664 (holding that the insider trading test "requires courts to focus on objective criteria, i. e., whether the insider receives a direct or indirect personal benefit from the disclosure, such as a pecuniary gain or *a*

6

*reputational benefit* that will translate into future earnings.").

These statements support the definition for personal gain approved of in *Andrews v. Shulsen*, 600 F. Supp. 408, 424 (D. Utah 1984), which approved of an instruction defining personal gain under Utah law as an act done "so as to gain a substantial advantage or to rid oneself of substantial difficulty." The definition is straightforward, limited in nature, and accurately reflects the structural goal of 42 U.S.C. § 1320d-6(b): to penalize actions taken out of a particularly bad motive. Personal gain should thus be defined to include non-monetary gain. For example, developing a long-term relationship with a benefactor, even if no immediate gift is immediately forthcoming. Such a logic applies even— indeed especially – if that benefactor is a foreign adversary to whom the defendants are looking as a safe have to flee to and start their lives over again, and to provide their children with "a nice flight to Turkey to go on vacation" to boot. *See* ECF 75, at 6.

## CONCLUSION

The Court should instruct the jury consistent with the arguments above. A sample jury instruction is provided at Attachment A.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____

Aaron S.J. Zelinsky
P. Michael Cunningham
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day, a copy of the foregoing motion was electronically filed via CM/ECF which provides notice to counsel of record.

_____/s/_____
Aaron S.J. Zelinsky
Assistant United States Attorney