# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| | * | |
| v. | * | **CRIMINAL NO.  1:22-336-SAG** |
| | * | |
| | * | |
| **ANNA GABRIELIAN and** | * | |
| **JAMIE LEE HENRY,** | * | |
| | * | |
| Defendants. | | |

**. . . . . . . . . .**

## DEFENDANTS' RENEWED MOTION FOR JUDGMENT OF ACQUITTAL

Introduction........................................................................................ 1

Standard of Review............................................................................. 2

Argument........................................................................................... 3

I.   GOVERNMENT ARGUMENTS THAT THE JURY COULD CONVICT BECAUSE DEFENDANTS ACTED TO PREVENT HARM FROM THE KGB ESTABLISH ENTRAPMENT AS A MATTER OF LAW, EITHER ALONE OR IN COMBINATION WITH OTHER RELEVANT EVIDENCE............................... 3

    A.  Government Counsel Were Right—The Evidence Demonstrated That Defendants Complied With The Undercover's Request For Medical Records To Avoid Harm From Russian Intelligence............................................. 6

       1.  The transcripts with the UC and Dr. Gabrielian's testimony establish that Defendants Disclosed IHII avoid harm from Russian intelligence................................................. 6

       2.  The evidence established that Defendants' fears of Russian intelligence was entirely reasonable........................................ 8

    B.  Government Counsel's Statements Are Admissions By A Party Opponent............................................................................ 10

    C.  Government Counsel's Statements Establish Entrapment As A Matter Of Law—Defendants Could Not Have Been "Ready And Willing" To Violate HIPAA Before Encountering The UC If They Acted Out Of Fear To Avoid Harm................................................................................. 11

    D.  The Government's Inconsistent Arguments Go To The Core Of The Entrapment Defense, Violating Due Process........................................ 12

    E.  The Entire Evidentiary Record Supports An Entrapment Defense Far More Strongly Than The Leading Supreme Court Cases Finding Entrapment As A Matter Of Law......................................................... 14

       1.  Undisputed contemporaneous evidence demonstrated that before the UC approach, Defendants disapproved of Russia's invasion and wanted to provide humanitarian aid to both sides in the Russian/Ukrainian war........................................................... 14

       2.  The undercover tapes confirmed Defendants' intent to provide medical assistance to soldiers and civilians................................. 16

3.  The Government must prove predisposition through the undercover tapes; it has no other predisposition evidence............. 19

4.  Defendants indisputably and repeatedly expressed reluctance to violate HIPAA ................................................................... 19

5.  After meeting 3, the UC reported Defendants denied access to classified information; Government counsel identified a 10-year felony that would fit, and decided to solicit an improbable crime................................................................................. 28

6.  The UC minimized the importance of the requested medical records and appealed to Defendants' humanitarian motives as part of her attempt to persuade Defendants to violate HIPAA................................................................................. 30

7.  How could Defendants have been "ready and willing" to commit a crime no one had even conceived of until Government counsel "found an offense" under HIPAA?.................................................. 32

8.  Defendants were not "positionally predisposed;" the Government failed to prove a scenario where Defendants could be offered a real world, non-threatening "favorable opportunity" to commit the charged offenses.......................................... 34

9.  This record of entrapment is far stronger than the facts in Sherman and Jacobson, where the Supreme Court found entrapment as a matter of law................................................ 39

II.  THE EVIDENCE SHOWED THAT THE GOVERNMENT'S FUTURE "PERSONAL GAIN" THEORY VIOLATED RULES OF STATUTORY INTERPRETATION, FAILED TO ESTABLISH THE REQUIRED SPECIFIC INTENT, AND WOULD MAKE THE STATUTE VOID FOR VAGUENESS AS APPLIED................................................................................. 41

III.  GOVERNMENT PROOF OF INTENT TO "MALICIOUSLY HARM" THE UNITED STATES WAS INSUFFICIENT AND SPECULATIVE..................... 46

A.  Dr. Henry Did Not Join A Conspiracy To Provide Medical Records Of Important Political Figures................................................ 46

B.  The Evidence Was Insufficient To Establish That Defendants Intended "Malicious Harm" To The United States By Providing IHII Of Ordinary Patients With Vague Connections To Government Employment..............   49

C.  Even A Motive To Harm The United States Cannot Support Specific Intent To Harm By Disclosing Medical Records...................................   53

Conclusion.................................................................................   54

**INTRODUCTION**

In closing, Government counsel argued repeatedly that the evidence supported conviction on the theory that Defendants violated HIPAA intending to personally gain by preventing the KGB from harming them or their family. Tr. 5/30/23 at 11, 25. Government counsel's argument established entrapment as a matter of law. Because Defendants violated HIPAA to avoid harm, they could not have been "ready and willing" to violate HIPAA *before* the Government's undercover sting created that fear.

The Government argued that Defendants disclosed unimportant medical records to build a relationship with Russian intelligence that would lead to some future benefit, including the opportunity to provide humanitarian medical assistance. The Government's "future gain" theory confused motive for intent, and failed to meet the "immediacy" requirement for specific intent. The "future gain" theory requires a statutory construction that would violate the rule of lenity and make the "personal gain" requirement void for vagueness as applied to Defendants' conduct.

The Government's evidence and case theories blurred the distinction between the initial UC discussions about patient records of important political figures versus the disclosures of records from ordinary patients that the Government asked Defendants to commit. There was insufficient proof that Dr. Henry joined a conspiracy to provide medical records of important figures in the future. For a conspiratorial agreement to produce ordinary patient records, and for the eight substantive counts, the Government's proof of an intent to maliciously harm the United States was clearly insufficient. The Government argued only one specific

factoid from the medical records to support its theory that disclosing IHII would make patients "turnable" by Russian intelligence—a retired government employee's prescription for Bupropion. To suggest that Defendants believed that a government retiree's prescription for a drug that might treat mild depression or help him quit smoking would cause Russian intelligence to recruit that employee as a spy, or make the employee more likely to succumb, is *ludicrous*.

This desperate theory of harm to the United States cannot support guilt beyond a reasonable doubt. It also shows that the Government's overbroad, undefined theory of harm to the United States renders the statute void for vagueness as applied.

## STANDARD OF REVIEW

Under Federal Rule of Criminal Procedure 29(a), "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Although the evidence is to be "viewed in the light most favorable to the prosecution," *United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005), a conviction can only be sustained where the evidence is "substantial." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "[T]o avoid a Rule 29 judgment of acquittal, the government must have presented sufficient evidence to support a conviction based on reasonable inferences, as the fact finder is not entitled to make 'leaps of logic.'" *United States v. Crounsset*, 403 F. Supp. 2d 475, 479 (E.D. Va. 2005) (quoting *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994)).

The Court should grant a Rule 29 judgment of acquittal where the government's case rests on "missing, flawed, or contradictory facts" that lead to the conclusion that no reasonable trier of fact could hold the defendant guilty beyond a reasonable doubt. *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011). The court need not "blindly and uncritically accept that every inference the prosecution argues can be reasonably be drawn from the circumstantial evidence in the record". *United States v. Gen. Elec. Co.*, 869 F. Supp. 1285, 1290 (S.D. Ohio 1994).

When there are innocent explanations for a defendant's conduct, the government has the burden to negate them. *United States v. Law*, 528 F.3d 888, 896 (D.C. Cir. 2008).

## <u>ARGUMENT</u>

### I.   GOVERNMENT ARGUMENTS THAT THE JURY COULD CONVICT BECAUSE DEFENDANTS  ACTED TO PREVENT HARM FROM THE KGB ESTABLISH ENTRAPMENT AS A MATTER OF LAW, EITHER <u>ALONE OR IN COMBINATION WITH OTHER RELEVANT EVIDENCE.</u>

In closing, Government counsel argued repeatedly that the evidence supported conviction on the theory that Defendants intended personal gain by violating HIPAA to prevent the KGB from harming them or their family:

> even if you accept the representation that this information was disclosed because "I was so afraid of the KGB, that they were going to do something to me, something to my family," despite the fact that by her own acknowledgment, Dr. Gabrielian couldn't recall any incident of KGB having taken some kind of harmful acts against a person in the United States, even if you want to credit that that was the motive behind this disclosure, that was a personal gain. That was to deflect the interests of the KGB as against Drs. Gabrielian and Henry.

> . . .

3

> Even if you accept the proposition that she did it to get the KGB off her back and not to cause any harm to her or her family, that's a personal gain to both her and Major Henry, and it suffices to meet that element.[1]

These statements were not inadvertent or accidental; Government counsel were on notice that the defense considered them exculpatory. At the May 5 motions hearing two weeks before trial, Government counsel first stated this theory that the Government could create fear during an undercover operation, and then convict Defendants for acting to avoid that fear:

> Trying to get yourself out of a thorny situation, getting the KGB off their back -- if that's the defense the defendant will put on -- that, the Government would argue, would also satisfy personal gain. It doesn't have to be monetary. It has to be something substantial -- we'll brief this additionally – and something of value. But there is no doubt that trying to get, in the defendants' view -- if that's going to be their argument -- the KGB to go away and to use the records in order to get something of personal gain, which is to get themselves out of a sticky situation they had gotten themselves in, that's personal gain for the defendant. Just like it would be if, for example, they were in a gang and in order to get out of the gang, they had to provide some sort of special, secret information from something. That would be personal gain. They're getting something of value. [Tr. 5/5/23 at 21-22.]

Defense counsel immediately argued that Government counsel's statement were admissions by a party opponent, and asked for confirmation in writing:

> MR. MEAD: I just want to confirm what I just heard: The United States contends that the undercover recordings prove beyond a reasonable doubt that the defendants turned over the records to get themselves out of a jam with Russian intelligence. I want to make sure I heard that.
>
> THE COURT: I think there were alternative theories that he mentioned.

---

[1] Tr. 5/30/23 at 11, 25. After Government counsel made those statements, Defense counsel renewed their motion for judgment of acquittal, arguing that Government counsel had established entrapment as a matter of law. The Court reserved ruling and allowed briefing. Tr. 5/30/23 at 26-27.

MR. MEAD: Sure, but that was one. In other words, that's what the Government alleges as one theory of personal gain. I just heard it in this court, and I want to make sure we're not backtracking.

MR. ZELINSKY: Your Honor, I want to be crystal clear as to what's going on here. What we said is the Government has a clear theory of personal gain which is that the personal gain that was present was to show their value, their worth, to the Russian agent to build a long-term relationship. But in the alternative, even if the jury is to believe the defendants' notion -- which is not correct in the Government's view -- but in the alternative, even if the jury is to believe the defendants' notion, they still committed criminal conduct.. . ..  But even if the jury is to believe the defendants' notion, which is not what the Government is going to be putting forward in the alternative, then there is still criminal culpability for purposes of personal gain.

THE COURT: Does that clarify things?

MR. MEAD: No, because it's not permissible. In other words, the Government cannot say: We disagree with a set of facts that the defendant is proposing but, but as your government, as the prosecution, we say, "If you believe that beyond a reasonable doubt, they're guilty." That's what he's saying, and I would like to get that in writing, Your Honor. It's impermissible, but it's also an admission by a party opponent. [Tr. 5/5/23 at 23-24.]

. . .

THE COURT: I'm not sure where we are either. Where I see things right now -- and first of all, we've had representations made in open court, transcripts are available; I don't see any need to put anything further in writing with respect to what the Government's theory of the case that they've articulated is. To the extent that there are motions to be raised by what the theory that's been articulated is, you're free to do that, Mr. Mead.

Government counsel also argued in closing that the UC's knowledge about Dr.

Gabrielian's  family background  made her "turnable:"

medical records of the family of someone who's in the United States intelligence community, those are sensitive and private information; the

disclosure of which can bring harm to those people and the disclosure of which can cause harm to the security of the United States. And how do you know that? How do you know that that's a problem? The defendant testified to it herself. She said that when medical records -- if the undercover had had access to her medical information, that would have made her really concerned. In fact, she claims that she was powerless and a United States Army major were powerless to stop this representative of the Russian government. They had to go along -- why? Because the person knew her middle name. [Tr. 5/30 at 34.]

This was a further admission that Defendants acted out of fear to avoid harm.

> **A.    Government Counsel Were Right—The Evidence Demonstrated That Defendants Complied With The Undercover's Request For Medical Records To Avoid Harm From Russian Intelligence.**
>
> **1.    The transcripts with the UC and Dr. Gabrielian's testimony establish that Defendants Disclosed IHII avoid harm from Russian intelligence.**

Dr. Gabrielian believed that she and Dr. Henry had to pass the UC's loyalty test to avoid retaliation from Russian intelligence:

> When she asked for records, it was a matter of passing a loyalty test because the KGB thought that Jamie was a plant or a provocation. We come together. That means that I'm a plant or a provocation, so I was very fearful of failing in their eyes and being seen as a threat to be dealt with. [Tr. 5/26/23 at 58.]
>
> Q. Now I'm on the top of page 39 [of GX 6]. "We need to, like, verify to make sure this is not some kind of setup." Do you see that?
> A Yes.
> Q Was that concern voiced by the agent a concern of yours throughout the rest of your interactions with her?
> A Yes, because if I'm setting up a KGB agent, it does not bode well for my health. [Tr. 5/25/23 at 212.]
>
> I didn't think I could give a firm no. I thought that my best bet was to give a detailed explanation of why I couldn't do it, and to hopefully get the agent to agree with my reasoning. [Tr. 5/26/23 at 24.]

6

The UC recordings corroborated that Defendants were afraid of Russian intelligence. At the end of meeting 2, Dr. Gabrielian saw the UC's concealed camera and asked if she was being recorded. GX 6 at 77-8. As Dr. Gabrielian testified:

> Q And you responded by saying, at the bottom of page 77, "I just don't even know how dangerous this is on the one hand."
> A Yes.
> Q What danger were you perceiving?
> A I mean, right now, I'm in deep waters, and it's just a very scary situation from all angles. What exactly does the KGB want with me? What is this tape going to be used for? I am out of my depth here.
> Q If we continue to the top of page 78, you say, "I mean, I know that it can be dangerous but to what extent? In other words, yeah, it could mean the loss of my career and the need to relocate. But I hope it will not be more dangerous than that because I truly have enough excitement up to here." What do you mean?
> A I don't want to be involved in any unsavory business. The most unsavory thing that I'm willing to do is meet with this KGB operative and hand over some medical protocols for the military, and that's the extent of my unsavoriness. [Tr. 5/26/23 at 31-2.]

At the beginning of meeting 3, the UC asked Dr. Henry how he was feeling. As Dr. Gabrielian testified:

> Q So when you walked into that hotel room with the agent, do you recall her asking your husband, "How do you feel, Jamie?"
> A Yes.
> Q What did he say?
> A He said, "Not scared." [GX. 6 at 93.]
> Q Did you have any discussion in the undercover's presence happen to that point that would cause anyone in the substance of the conversation to mention not being afraid?
> A No, but it was a scary situation to us too.

Most telling, later in meeting 3, Dr. Gabrielian plaintively asked the UC not to kill her Ukrainian colleague Dr. Oleg:

> Q Page 125 of the transcript [GX 6], middle of the page, you're

> talking about your colleague, who doesn't have connections to
> Ukraine, is going to Ukraine personally?
> A Yes.
> Q And you say something about your Ukrainian colleague. You
> say, "Try not to kill him."
> A Yes.
> Q You've heard the tape. What happens to the volume of your
> voice when you say that?
> A I say it very quietly.
> Q Why?
> A I don't think I have any standing to tell the KGB who to
> kill and who not to kill. The only thing I can do is plead it.
> I can't tell her not to do it.
> Q Were you worried about your friend now that you're talking
> to a Russian intelligence officer about how much help he's
> offering Ukraine?
> A Yes. [Tr. 5/26/23 at 39.]

There is no contradictory "inference" to overcome this overwhelmingly exculpatory evidence that Dr. Gabrielian believed she was dealing with an organization that might kill an American doctor for providing medical assistance in Ukraine. Government counsel never mentioned it. Instead, they argued in the alternative that if Defendants acted to avoid harm from the KGB, the jury should convict Defendants anyway for intending personal gain.

### 2.     The evidence established that Defendants' fear of <u>Russian intelligence was entirely reasonable.</u>

The Government filed a motion asking that the UC testify wearing a disguise and using a pseudonym. The Government told this Court: "These protections are necessary in order to protect the safety of the UCE." Dkt. 64 at 1. The Government told this Court: "there is a legitimate risk that individuals associated with the Russian Government are actively seeking to identify law enforcement offices and share that information with others." Dkt. 64 at 6. The UC testified:

Q. . . . in terms of public reports – and even statements by the United States government; by our State Department, by Congressional committees, it is widely reported that Russian intelligence murders people abroad.

A. Correct. [Tr. 5/24/23 at 78.]

Q. Okay. Individuals associated with the Russian government are actively seeking to identify law enforcement officers and share that information with others, correct?

A. Yes.

Q. And if Russian intelligence learned your identity, that would create a safety risk for you and your family, correct?

A. Presumably. [Tr. 5/24/23 at 102-3.]

The Government's case agent, FBI Special Agent Walker, testified:

Q. So, again, one of your jobs in counterintelligence is to protect American citizens from approaches by Russian intelligence, correct?"

A. Correct."

Q. Because you know those people are dangerous, correct?

A. They are.

Q. They lie, correct?"

A. They do.

Q. They use blackmail, correct?

A. Open source, yes. I've seen that before, yes. [Tr. 5/25/23 at 68.]

Q. If I'm an American citizen dealing with someone I believe is an FBI agent, when that person says, "You don't have to break the law, you can walk away from it," as an American citizen, I can trust that, can't I?

A. Yes.

Q. I can take it to the bank, correct?

A. Yes.

Q. Because the FBI is honorable and it tries not to harm its own citizens?

A. Correct.

Q. But that is not true of Russian intelligence officers, is it?

A. I mean, that's why we have the FBI in America. [Tr. 5/25/23 at 108.][2]

---

[2] Despite these admissions and the extensive history of Russian intelligence brutality, Government counsel argued in closing that Defendants' fears were "imaginary." Tr. 5/30/23 at 3. Even while arguing that the jury could convict on the theory that Defendants acted to avoid harm from the KGB, Government counsel emphasized that on cross examination, "Dr. Gabrielian couldn't recall any incident of KGB having taken some kind of harmful acts against a person in the United States." Government closing argument, Tr. 5/30/23 at 11. This argument not only ignored Dr.

**B.     Government Counsel's Statements Are Admissions By A Party Opponent.**

> Though case law on the issue is scarce, the principle that an admission of counsel during trial "may dispense with proof of facts for which witnesses would otherwise be called" has been recognized by the Supreme Court since 1880. *Oscanyan v. Arms Co.,* 103 U.S. 261, 263 (1880). A court's power to act "upon facts conceded by counsel is as plain as its power to act upon the evidence produced." *Id.* However, only statements that are "clearly established" by counsel will be treated as judicial admissions. *Id.* Consistent with the principle in *Oscanyan,* the Fourth Circuit has stated that, **"a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party."** *U.S. v. Blood,* 806 F.2d 1218, 1221 (4th Cir.1986). *Accord, Martinez v. Bally's Louisiana, Inc.,* 244 F.3d 474 (5th Cir.2001); *MacDonald v. General Motors Corp.,* 110 F.3d 337 (6th Cir.1997); *U.S. v. McKeon,* 738 F.2d 26 (2nd Cir.1984); *Glick v. White Motor Co.,* 458 F.2d 1287 (3rd Cir.1972). Of course, what a court can consider a judicial admission "is restricted to unequivocal statements as to matters of fact which otherwise would require evidentiary proof; it does not extend to counsel's statement of his conception of the legal theory of a case." 30A Wright & Graham, FEDERAL PRACTICE & PROCEDURE § 7026 (2000).

*Hall v. Wal-Mart Stores E., LP*, 447 F. Supp. 2d 604, 608–11 (W.D. Va. 2006)(emphasis in original). The Fourth Circuit has repeatedly said that this rule applies to statements by Government counsel. *See United States v. You*, 113 F.3d 1233 (4th Cir. 1997); *United States v. Bridges*, 43 F.3d 1468 (4th Cir. 1994); *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986).

---

Gabrielian's fears for her family in Russia, but also ignored the Government's *Brady* and Rule 3.8 obligations. On June 19, 2023, the New York Times reported that Russia had attempted to retaliate against a defector living in Florida in 2020. *"Russia Sought to Kill Defector in Florida,"* https://www.nytimes.com/2023/06/19/us/politics/russia-spy-assassination.html?campaign. Individual Government counsel may not have known about that episode, but for representatives of the United States to say that Defendants' fears were "imaginary" was unfounded and unfair.

Arguing that the jury could convict on the theory that Defendants violated HIPAA to avoid harm from the KGB is an unambiguous statement that there was sufficient evidence to prove that Defendants acted to avoid harm from the KGB beyond a reasonable doubt. Indeed, Government counsel explicitly argued that the evidence of motive to avoid harm from the KGB "suffices to meet that element." Tr. 5/30/23 at 25.

C.   **Government Counsel's Statements Establish Entrapment As A Matter Of Law—Defendants Could Not Have Been "Ready And Willing" To Violate HIPAA Before Encountering The UC If They <u>Acted Out Of Fear To Avoid Harm.</u>**

"[T]he prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act *prior to first being approached by Government agents.*" *Jacobson v. United States,* 503 U.S. 540, 548-49 (1992)(emphasis added). The Court instructed the jury: "A person is not entrapped when that person has a previous intent or disposition or willingness to commit the crime charged and law enforcement officers merely provide what appears to be a favorable opportunity to commit the offense." [Court's final condensed jury instructions at 26.] The Court's supplemental entrapment instruction again emphasized that the Government had to prove Defendants were "merely . . . awaiting a favorable opportunity,"

Government counsel acknowledged that the evidence was sufficient to prove that Defendants "did it to get the KGB off [their] back and not to cause any harm to [them] or their family." [Tr. 5/30/23 at 25.] That turns predisposition and "merely provid[ing] a favorable opportunity" on their heads. The Government cannot seriously contend that an undercover operation that motivated Defendants to commit a crime

11

to avoid harm from the KGB was "merely" a "favorable opportunity." And if the Government is willing to argue that Defendants were always "ready and willing" to break the law to save themselves and their family from harm, we are all predisposed.

### D. The Government's Inconsistent Arguments Go To The Core Of The Entrapment Defense, Violating Due Process.

The Fourth Circuit has recognized that the Government may not pursue inconsistent theories of guilt on the same evidence without violating due process:

> As the district court recognized, we have stated that "the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants." *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003). *But see DeCastro v. Branker*, 642 F.3d 442, 458 (4th Cir. 2011) (qualifying *Higgs* statement as dicta).

*United States v. Lopez*, 860 F.3d 201, 216 (4th Cir. 2017).

> A due process violation may occur "if 'an inconsistency ... exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime,'" [*United States v. Higgs, supra,* 353 F.3d at 326] (quoting *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir.2000)), or if "the evidence used at the two trials is 'factually inconsistent and irreconcilable,' " *id.* (quoting *United States v. Paul*, 217 F.3d 989, 998 (8th Cir.2000)).

*United States v. Fulks*, 683 F.3d 512, 524 (4th Cir. 2012).

This due process issue typically arises in separate trials, often in capital cases involving multiple defendants, where the Government takes arguably inconsistent positions about the roles and relative culpability of joint criminal actors. *See, e.g., Bradshaw v. Stumpf,* 545 U.S. 175, 189-90 (2005)(Sutter, J., concurring). Perhaps because what the Government did to this bizarre fact pattern is so rare, defense counsel have not found any cases addressing the due process implications when prosecutors present inconsistent theories of guilt against the same defendants on the same evidence in the same trial.

But the due process violation is even clearer when the Government argues in the alternative for guilt based on two contradictory theories from the same evidence. Here, Government counsel in closing took the *Brady*-violative position that Defendants' fears were "imaginary" because Russian intelligence doesn't retaliate on American soil, and that Defendants were always ready and willing to help Russia in any way possible. Then Government counsel argued in the alternative that even if Dr. Gabrielian acted to avoid "harm to her or her family, that's a personal gain to both her and Major Henry, and it suffices to meet that element."

Defense counsel moved for dismissal immediately and tried to address the Government's inconsistent positions in closing argument. But it appears that 11 jurors thought they were free to disregard the inconsistency. After all, Government counsel vouched for the "they really weren't afraid, they were always ready and willing" theory as stronger, while still hedging their bets and arguing for conviction even if Defendants acted to avoid harm to themselves or their family. The jurors probably thought they were free to choose either alternative, without understanding that the Constitution's due process requirement of proof beyond a reasonable doubt prohibits the Government from offering two inconsistent paths to guilt on the same evidence.

When the Government argues in the alternative for two inconsistent theories, it would violate due process to convict on either theory—by definition, the Government's inconsistent argument create reasonable doubt. What the Government did here is the equivalent of trying two defendants before the same jury for a murder

13

that only one of them could have committed, and arguing, "We think the first guy did it, but if you believe the first guy's testimony, you can convict the second guy instead."

### E.    The Entire Evidentiary Record Supports An Entrapment Defense Far More Strongly Than The Leading Supreme Court Cases Finding Entrapment As A Matter Of Law.

Government admissions that Defendants acted to avoid having the KGB cause harm to them or their family are enough, standing alone, to establish entrapment as a matter of law and prevent conviction under the due process clause. The entire evidentiary record strongly corroborates those Government admissions. This record demonstrates entrapment as a matter of law far more strongly than the facts in the two leading Supreme Court cases finding entrapment as a matter of law—*Sherman* and *Jacobson*.

#### 1.    Undisputed contemporaneous evidence demonstrated that before the UC approach, Defendants disapproved of Russia's invasion and wanted to provide humanitarian aid to both sides in the Russian/Ukrainian war.

Dr. Gabrielian's mother identifies as Ukrainian; Dr. Gabrielian has relatives there. Before the war, Dr. Gabrielian had worked closely with her Ukrainian colleague Dr. Oleg on grants to improve medical care in Ukraine. Tr. 5/25/23 at 140, 168-71; Gabrielian Exs. 1-3. When Russia invaded Ukraine in late February, 2022, Dr. Gabrielian helped Dr. Oleg gather and pack medical supplies for a medical mission to Ukraine, and continued to work with him to provide medical assistance there during the war. Tr. 5/25/23 at 173-74, 176-77, Gabrielian Exs. 5, 8-9, 28. In texts with friends in early March, Dr. Gabrielian talked about her desire to provide medical help to civilians and soldiers on both sides, and her impractical urge to go on

14

medical missions to the war zone. She also talked about "Russian kids sent to die for someone else's ego . . . On a whim." Tr. 5/23/23 at 182- 87; Gabrielian Exs. 6, 7.

The entire text thread between Defendants on March 1, 2022, demonstrated their true intent and "predisposition." They discussed the possibility of going on medical missions to either the Ukrainian or Russian sides of the front lines, and discussed reaching out to Doctors Without Borders and the Russian embassy. They referred to a war they did not believe in. Gabrielian. Ex. 28. In the midst of these concerns for soldiers and civilians on both sides, Dr. Gabrielian emailed and called the Russian embassy saying that she was a doctor at Hopkins and her husband was a U.S. Army doctor, and offering medical assistance. She emailed a Moscow medical school making the same offer. Stipulation, GX 11; Gab. Ex. 14.

FBI Agent walker admitted:

> Q. You would agree with me, wouldn't you, that the email she wrote to the Russian embassy and the email that she wrote to the Moscow medical school were innocuous?"
> A. Yes.
> Q. They appear to be offering humanitarian cooperation, correct?
> A. Yes. [Tr. 5/25/23 at 63.]

The Government stipulated that there was no further contact between Dr. Gabrielian and the Russian embassy after Dr. Gabrielian's email and call on March 1. Agent Walker testified that the FBI did background investigations on both Defendants and found nothing negative. Tr. 5/23/25 at 71.

In sum, the undisputed, contemporaneous evidence from the period before the first UC approach demonstrated that Defendants disapproved of the war and wanted to provide humanitarian medical assistance to both sides. There was no evidence, no

reasonable inference, that before August 17 Defendants intended to provide medical records to Russia, wanted to maliciously harm the United States, sought personal gain by building a relationship with Russian intelligence, or wanted to precipitate a "thorny situation" that they could get themselves out of by providing medical records to avoid harm from the KGB.

### 2. The undercover tapes confirmed Defendants' intent to provide medical assistance to soldiers and civilians.

Defendants told the UC they didn't want money. GX6 at 48, 97, 173, 313. Government counsel conceded that Defendants did not intend to benefit financially. Tr. 5/23/25 at 18. Throughout their interactions with the UC, Dr. Gabrielian and Dr. Henry consistently offered medical assistance and technology to civilians and Russian soldiers.

> AG:   . . . And I also see to what extent–in other words, I have to tell you the whole story. When I came to Hopkins, I was working with a Ukrainian doctor. . . And I can see how much he helps his country. How can I do better than he does? Moreover, he is now going to the war zone, to help them. . . And how can I not do such a minimal thing as to meet with a person and say, "Well, here, I can help in some way". [GX. 6 at 49.]
>
>                                           . . .
>
> AG:   This time, he gave our protocols to Ukrainian hospitals, so they-- improve       their medical–well, efficiency . . . He gives them supplies. . .     Meaning, if we have extra supplies, then he gi-gives to them. . . [UI].     Uhm…He helps them create protocols at the National level----and that [UI] absolutely terrible. In other words, on one hand – you and I are having a meeting, and on the other hand – he will have three  presentations about how we helped by using ultrasound medicine in     Ukraine. . . So, I feel slightly conflicted. . . And I don't wish him any ill will.

But he helps his country very much, and how can I just sit and not help at all? [GX. 6 at 51.]

. . .

AG:    . . . this is more of an altruistic action – than anything, then—that we would benefit from. . . We have more to lose than we do to gain – from this. And truly, my love of my country is what's driving me.

JH:    For me, it's my hate of war. And just, uh, you know, I-I think the United States, in my experience, having been in the military for twenty-two years, is—We instigate a lot, and we are very, uh, arrogant in what we think we know and what we can do with the tools that we have—you know? And it has— hurt many, many people. . . [GX 6 at 97-98.]

. . .

AG:    [OV] [Oleg]—he went on a medical mission, which is [UI]—It's hard for me to watch somebody [noise] go and support their country and not do anything on my side— but he was not involved in combat. So he shipped out the tourniquets—
UC:     [OV] Mm-hmm.
AG:    —he [UI] shipping out the airway equipment, and I would like to show you the ultrasound, um, workshops and the airway workshops—
UC:    Mm-hmm.
AG:    —that have been involved, to see if this can replicated at all. . . . Because those can be successful and life-saving. [GX 6 at 105.]

. . .

JH:    I-I went into medicine 'cause I was interested in humanitarian— y-you know, doing overseas— I went into the military, thinking that I was going to do humanitarian— —healthcare. I've been in Germany.—That's it. And I volunteered to go to Iraq, they wouldn't let me go. [GX 6 at 148.]

. . .

AG:     —and regional anesthesia program in a war zone.
UC:     Mm-hmm.

17

AG:   So, literally, you have regional anesthesia. It means that you don't
         need general anesthesia.--You can save and operate on people
         that you would have never been able to save and operate on. You
         can save limbs, you can do it remotely, and you can do it safely.
         What this means [noises] is you don't need access to [UI]—you
         don't need access to anesthetic gasses. You would only need an
         ultrasound, a needle, and local anesthetic. [GX 6 at 116-17.]

. . .

JH:   Yeah, yeah. And uh, I have been trained in all of that— you
         know? And, I mean, it sounds like both sides need a lot of help—
UC:   [OV] Mm-hmm.
JH:   —so people don't die.[GX 6 at 118.]

At trial, the UC acknowledged that Dr. Gabrielian had repeatedly offered

medical technology that Russia could use to save lives:

> Q She was showing you medical technology about portable
> ultrasounds, correct?
> A Correct.
> Q And she was talking to you about how valuable those
> portable ultrasounds could be.
> A Yes.
> Q Both to civilians and to wounded soldiers, correct?
> A Correct.
> Q And –
> A And she wished that it could be used for the Russia side
> as well. That's the context. [Tr. 5/24/23 at 72; GX 6 at 188.]

After passing the UC's "loyalty test," Dr. Gabrielian's last communication with the

UC was to text "medical developments that I really wanted to get across to the

Russian medical system." [Tr. 5/25/23 at 69; Gab Ex. 10.]

Government counsel apparently conceded these humanitarian motives,

arguing in closing that a desire "to stand with Russia as it commits atrocities against

Ukraine" and an "intent to help Russia, the motherland, in any way possible" "are

not inconsistent nor incompatible with the motives of humanitarian assistance,

helping people . . . ." Tr. 5/30/23 at 2-4. There was no evidence or reasonable inference supporting the Government's inflammatory illogic about Defendants' intent "to stand with Russia as it commits atrocities against Ukraine." Defendants' humanitarian motives and assistance to Ukraine are fundamentally inconsistent with an intent to maliciously harm the United States or personally gain from building a relationship with the KGB.

### 3.   The Government must prove predisposition through the undercover tapes; it has no other predisposition evidence.

As demonstrated above, there was no evidence from the period before the UC first approached Dr. Gabrielian that Defendants "had an intent or disposition or willingness to commit the crimes charged," and were "merely . . . awaiting a favorable opportunity to commit them" [Court's final condensed jury instructions at 26; Court's supplemental instruction in response to jury question.] Accordingly, Defendants' interactions with the UC are the only evidence that could satisfy the Government's burden to prove predisposition beyond a reasonable doubt.

### 4.   Defendants indisputably and repeatedly expressed reluctance to violate HIPAA.

During meeting 2 alone with Dr. Gabrielian, the UC repeatedly asked if Dr. Gabrielian and Dr. Henry had access to confidential, secret, or special information.

> UC:   So, when you wrote and called - did you have something specific in mind?               Because, depending on the type of information we have . . . well—
> AG:   [OV] Different [UI]
> UC:   [OV] --yes, according, for-for-format will be different, like it will be managed and processed differently. [GX 6 at 33.]
>
> . . .

19

UC:    Uh-huh. Um, assistance extending only to the medical sphere, or to some others—well, because ch- [GX 6 at 36.]

. . .

UC:    Uh-huh. The fact that it is medicine is good, but right now, we are so focused on—
AG:    On other things.
UC:    --on other things, right?—that, of course assistance in this work, specifically, would be invaluable. In other words, any kinds of—not insights—but any, like, support, along the lines of—if your husband has any—or had, or—access. [GX 6 at 36.]

. . .

UC:    That would be, like, good information for us if—regarding trainings like these     that they conducted—if he could say anything at all, then of course we would be   very interested in that. [GX 6 at 38.]

. . .

UC:    Yes. Yes. I-I also understood that, um—Let's come back again, like,  specifically  to your area of expertise, and . . . could you describe to me, at least a little bit,   in   what   area   this assistance  could  be  applied?—Specifically in the current conflict—the situation that is taking place . . .[GX 6 at 40.]

. . .

UC:    Uh-huh. That is, uh . . . So, restore relations with the medical sphere —in the    medical sphere, in the area of research, right? Research development—uh,    what  kinds of . . . maybe share new—[GX 6 at 42.]

. . .

UC:    [discussing how Oleg was obtaining medical equipment for Ukraine] so, one has to send things in, like, roundabout ways. . .
AG:    I know, I know.
UC:    But you could . . . help us with something . . . Send…What kind of    specific equipment or     technology, because . . . uhm . . .[GX 6 at 52.]

. . .

UC:    Ok. Uh-huh. And do you remember how long that training was? How long was it ap- approximately? No? Uh-huh. [noise] And— [GX 6 at 62.]

. . .

UC:    Uh-huh. Well, maybe he has some kind of--I mean, access, in other words, some  kind of materials on hand that can be– [GX 6 at 63.]

. . .

UC:    [OV] So, as I understand it, in-in the Army er . . . sec--well, some kind of secret--       right?-clearance, or some kind of— [GX 6 at 64.]

. . .

UC:    Does he have anything on hand right now? I mean . . . what–
[       GX 6 at 64.]

. . .

UC:    I think it would be very interesting, if he has some special access to some kind of documents that— [GX 6 at 65.]

. . .

UC:    It is uncomfortable. I understand. But on the other hand,  as you said, the playing field is uneven, in other words, one country is being helped by the whole world, and we are, so to say, on . . . [GX 6 at 67.]

Dr. Gabrielian testified that she understood early on that was talking to a Russian intelligence agent who was fishing for confidential information. This agent knew details about Dr. Gabrielian's family and her work schedule. [Tr. 525/23 at 172-73, 205-06.]  The Government does not dispute that Dr. Gabrielian believed she was

21

dealing with Russian intelligence—its theories of personal gain include the allegation that Defendants intended to personally gain by building a relationship with the KGB.

Dr. Gabrielian consistently denied that she and her husband had access to special or confidential information. [GX 6 at 33-67.] It was in that context, where Dr. Gabrielian believed she was talking to a KGB agent who would be disappointed that Drs. Gabrielian and Henry had no access to confidential information, when Dr. Gabrielian first mentioned access to patient records:

> But regarding such very-very good information . . . I really don't have it . . . In other words, what can I do? Well, yes - someone important is possibly being treated at Hopkins. . . I can access the chart one time, and after that I will be fired with such scandal! . . . That--If I publish something with a Russian institute, that can be explained - those are my colleagues-- that is still international work, I have now become the director of international anesthesia, so here-- But if I open a chart of a person that someone wants to know something about-- just to check it out - I will be fired immediately." [GX 6 at 67.]

This first mention of patient records obviously does not create a reasonable inference that Dr. Gabrielian was "ready and willing" to violate HIPAA before August 17. Dr. Gabrielian explained the conversations with the UC about patient records that followed: "I didn't think I could give a firm no. I thought that my best bet was to give a detailed explanation of why I couldn't do it, and to hopefully get the agent to agree with my reasoning." [Tr. 5/26/23 at 24.] The undercover transcripts indisputably demonstrate that Dr. Gabrielian's explanation is the only reasonable interpretation of those discussions. During the rest of meeting 2, Dr. Gabrielian repeatedly said that she and Dr. Henry would get caught and be fired if they accessed patient records, and that patient records would be useless anyway:

If- if it would somehow radically change the situation, then——I would even be prepared to do it. But after that, I could boldly wave bye-bye Russia— I mean, goodbye to the States—and go to Russia— because, here, I would no longer be able to find a good job. In other words, to collaborate with Russia, yes; to publish everything, yes——but to rummage around in political . . . records——now, that's . . . Now, that's a 'no.' [exhales]" [GX 6 at 70.]

[OV] And for Jamie . . . for Jamie, it's even worse . . . because he still has this access, but he said to me, "two more weeks,"— —and . . . and I don't think that what we can give you will change everything to the extent——that it would be justifiable. [GX 6 at 70-71.]

Abstract help, yes. . . Non-specific things, yes. The protocols on how to build a hospital – he can always say, "I wanted to help my friends." . . . Even in Ukraine . . . Because we meet with this person – and it's true that we talk with him – because he is a good person – what else can be done, and [U/I] how to optimize. . . so it would be entirely reasonable to say, "I just wanted to help him."
 . . . But . . . this- I think this information would be even more useful to you then "at some time, someone had some kind of colonoscopy done, and the findings were. . ." . . . Because that is pretty irrelevant. [GX 6 at 71-72.]

                                         . . .

[OV] [UI] Well, I think that, here, it is pretty clear how it is possible to provide specific help. . . And I think that a doctor at Hopkins will always be useful to you. . . And now I'm not just some doctor there [UI] . . . That is to say, they have already made me a director, um, quality improvement for obstetric anesthesia. . . When my colleague . . . leaves his post—and he will do that two months from now—I will become the director of international, uh, obstetrical anesthesia. . . . . . and I don't want to take this job, but they are offering to make me the director of Wilmer Eye Institute— . . .And a Hopkins director – no matter what kind – will always be useful." [GX 6 at 73-75.]

Even when Dr. Gabrielian was joking with the UC about opening the

President's medical records (which neither Defendant had access to), she clearly

expressed reluctance: "I'll have to ask, because I don't know whether he can open the chart of the   president, —or not. [Either UI or][**But we are not going to open it.**]"[3]

Later in the evening of August 17, Dr. Henry joined Dr. Gabrielian and the UC for meeting 3. Again, in the first meeting 3 discussion about patient records, Dr. Gabrielian emphasized that she and Dr. Henry would be caught immediately if they tried to access medical records of an important person:

> AG:   . . .[talking to Dr. Henry] you're able to get on a computer, and you're able to look something up, and I already described that, the way the system is structured, as long as we stay to neutral things, it-it doesn't flag us. If we ever access . . . private health information—
>
> UC:   [OV] Mm-hmm.
>
> AG:   —or an important person, it flags us immediately. I think, in your case, if you climbed too high, it would just remove your access instantaneously. Me—I would just get called into the principal's office—
>
> UC:   [OV] Mm-hmm.
>
> AG:   —the next day and possibly fired.
>
> UC:   And [noises] out of curiosity, how high can you climb in that pole of importance, for the personal records?
>
> JH:   Uh, yeah, um, [noises] I've never. . .never tried. I mean, so . . . I've taken care of President Biden's mom—
>
> UC:   Mm-hmm.
>
> JH:   —you know? Like, uh, I mean I—working at Walter Reed—uh, took care of Bob Dole.
>
> UC:   Mm-hmm.
>
> JH:   Uh, he-it. . . It's not like I. . . I don't know how it is at the new Walter Reed. So, they shut down the old one, where I did all my training, and opened up the new hospital, or combined it with the naval hospital in Bethesda—

---

[3] GX 6 at 71. The words in bold reflect the only translation issue between the parties. Dr. Gabrielian testified to the Russian words she said on the tape. Government translators agreed that the words were reasonably interpreted as "But we are not going to open it," but could not hear them. The words are audible. *See* Tr. 5/26/23 at 25-27, 72. Dr. Gabrielian testified that she and the UC were laughing about opening the President's medical records. The laughter is audible on the tape. *See* Tr. 5/26/23 at 25-27.

UC:    Mm-hmm.

JH:    —and, uh, I don't know what they're-what their VIP ward is like anymore. I don't remember, um—

UC:    [OV] How long ago would that have been?

JH:    —Like, President Trump was there when he had COVID—

UC:    [OV] Yeah.

JH:    —um, but I don't recall—

AG:        [OV] So if-if—

JH:    —ever having to do any of that stuff. [GX 6 at 113-14.]

Later in meeting 3, the UC interrupted Dr. Gabrielian's attempt to describe life-saving anesthesia innovations by asking again about Dr. Henry's continuing computer access in the next two weeks before his anticipated departure from the Army. That led to the exchange that was the centerpiece of the Government's case:

AG: [OV] But this is how you get people out of—

UC: [OV] Mm-hmm.

AG: —hospitals and you divert the resources to better things. And better things, on both sides, are soldiers, who are—

UC: [OV] Mm-hmm. So I-I understand this part, of-of um—

[end of file 0128.009]

[beginning of file 0128.010]

UC: —definite value and what we can get from it—

JH: [OV] Yeah.

UC: —and I cannot imagine that they would, like, not take you up on this offer, but—

JH: [OV] Yeah.

AG: They—

UC: [OV] —I also have to ask you, because, I think you're in a unique position, and-you know, uh, with experience, and you're not there anymore, but you still potentially have access to something that—

AG: [OV] Two more weeks.

UC: —perhaps, my—

JH: [OV] At least—

UC: —colleagues will find of extreme importance.

JH: Yeah.

UC: So I will definitely put this in an—

JH: [OV] Yeah.

UC: —urgent, kind of, like, manner that—

JH: [OV] Yeah.

UC: —um. . . What is it, possibly, that they can see—

JH: [OV] Yeah.

UC: —whether you have—

JH: [OV] Yeah.

UC: —access, still, to.

JH: [OV] Yeah.

UC: So, you still have your laptop and your, I guess—

AG: [OV] No.

UC: —c-credentials? So I give it to—

JH: [OV] So, I have my credentials. I have my CAC, my—

UC: [OV] Yeah.

JH: —certificates—

UC: [OV] Mm-hmm.

JH: —all that stuff, you know. I mean, I have access to—I mean I-I-I have access to everything but my e-mail.

UC: Yeah.

JH: To all of the medical records—

UC: [OV] Mm-hmm.

JH: —there. I could've checked—

UC: [OV] Yeah.

JH: —from my home computer.

UC: Mm-hmm.

JH: But, I couldn't check my freaking e-mail.

AG: [OV] But, there is a [UI] ending [UI]

UC: Yeah, so-obviously as I-as I told—

AG: [OV] [UI]

UC: —your wife before, we-we're not trying to, in any way, shape, or form, put you at risk, right? Or-o-or put you in the position in where you sacrifice your whole life.

AG: [OV] But it also doesn't benefit you. Because if you have a useful long-term weapon that can be yours—

UC: [OV] Mm-hmm.

AG: —for years, if you use it for something that's not tactically advantageous, you've lost it, for nothing. So, if Jamie can't practice medicine—he can't be in the National Guard—you've lost an Army doctor.

UC: Mm-hmm.

AG: If I have to look somebody up, and I do look somebody up, and I lose my spot at Hopkins, you've lost your director at Hopkins—

UC: [OV] Mm-hmm.

AG: —to establish those medical connections. So if that's done, it has to be something that's awesomely important—

UC: [OV] Mm-hmm.

AG: —not just, "Let's just check if this person has polyps,"—

UC: Yeah.

26

AG: —or [UI].
UC: No, I—Trust me, if we ever get to the point—
JH: [OV] Yeah.
UC: —where they will, perhaps, have me pass you this type of request, it will be, probably, something that will be life-changing, right? Otherwise—
JH: [OV] [UI].
UC: —I can't imagine them—
AG: [OV] [UI].
UV: —putting, you know—
JH: [OV] Right.
AG: —and at that point—
UC: [OV] —like, yeah.
AG: —I want my kids to have a nice flight to Turkey, to go on vacation.
UC: Mm-hmm.
AG: Because I don't want to end up in jail here as my kids being held hostages over my head.
UC: Understood.
AG: So i-if you ask us something that makes it very clear where we stand—because this is a nice conversation about international medicine.
UC: Mm-hmm.
AG: But if we ever have to declare ourselves, um I don't [UI]—
JH: [OV] Look I-I don't even know your name and I don't want to, to be honest, because—
UC: [OV] That's why I'm not—
JH: [OV] Yeah.
UC: —I'm not, you know, sharing any details that I don't have to. [GX 6 at 120-25.]

It is clear from context that Dr. Gabrielian made the statements about being a "long-term weapon" and "los[ing] an Army doctor" in an attempt to persuade the UC that Russian intelligence should not ask for patient records from an important person. Dr. Gabrielian indisputably said that if that happened, Defendants would likely lose their jobs, risk going to jail, and be of no further value to Russian intelligence. In isolation, this passage may support an inference that Dr. Gabrielian might be willing to provide medical records sometime in the future for a hypothetical

important figure *if* she had access and *if* it was "awesomely important," or, as the UC said, a "life-changing situation."

But this passage does not reflect an agreement to provide unimportant medical records for ordinary patients, and does not reflect agreement from Dr. Henry. Indeed, in meeting 4 Dr. Gabrielian told the UC that Dr. Henry was unlikely to provide patient medical records.

Nor does the passage support an inference that Defendants were "ready and willing" to provide IHII before August 17.—it says just the opposite. Dr. Gabrielian was clearly trying to talk the UC out of asking for medical records from a hypothetical important person; she expressed fears of going to jail and losing her children. It is simply not reasonable to infer that this passage reflects that if Defendants had a non-threatening, unpaid "opportunity" to risk ending their careers, going to jail, and losing their family by providing Russia with medical records for an important political figure, Defendants would have said "sure, no problem, whose records do you want?" And as discussed in section I.E.8 below, other than through an FBI undercover operation, how would such an opportunity ever arise?

>    **5.    After meeting 3, the UC reported Defendants denied access to classified information; Government counsel identified a 10-year felony that would fit and decided to <u>solicit an improbable crime.</u>**

Far from being ready and willing to produce IHII to Russia at a favorable opportunity, Defendants ended meeting 3 having tried to talk the UC out of asking them to violate HIPAA. The UC admitted:

Q. Now in the second and third meetings you had talked first with Dr. Gabrielian a little bit, and then with Dr. Henry, and the subject of patient records had come up, correct?

A. Yes.

Q. And in those conversations, you had said words to the effect of, "You know, we probably won't ask you for patient medical records that are unimportant'" correct?

A. Yes.   [Tr. 5/24/23 at 85.]

Agent Walker testified that the UC reported back after meeting 3 that Defendants denied access to classified information, and "the focus of the investigation changed away from looking for classified information." Tr. 5/25/23 102.

Q. So after meeting 3, attorneys for the United States Attorney's Office on August 19 identified a HIPAA statute that would fit, correct?

A They did.

Q And that's the HIPAA statute that these two defendants are charged with, correct?

A Yes. [Tr. 5/25/23 at 102-03.]
. . .

Q And in addition to identifying the criminal statute that fit, the U.S. Attorney's Office for the District of Maryland sent you a definition of health-care information that was required to prove a crime under that statute, correct?

A Yes.

Q And you read that definition, correct?

A I did. [Tr. 5/25/23 at 102-03.]
. . .

Q But to be a crime, the information doesn't have to be important at all, does it? It literally can be: I had a hangnail, and here is my name and date of birth. That's enough to be a HIPAA violation, isn't it?

A Yes.

Q Right. So having been told by the U.S. Attorney's Office a crime that was new to you, right -- this is all new to you?

A It is. That's why I reached out to the U.S. Attorney's Office.

Q Right. So after being told a crime that fit, after realizing that the information didn't have to be important at all, you met with the undercover?

29

A We did, yes.

Q And you told the undercover what to ask for?

A I did.

Q You told the undercover "Just get us four or five medical records," right?

A Yes.

Q You told her "Doesn't have to be important," right?

A Not specifically, no. We just instructed her to ask for four or five medical records, yes.

Q And you told her to use her judgment about how to ask in the best way to get these two to break the law, right?

A We told her to be open-ended and to, you know, allow them not to say they were being forced to do anything. As she testified to earlier, it's not our place to dictate what the UC does in the meeting with individuals.

. . .

Q The question I'm asking is: You told her to use her judgment, to be as persuasive as possible to get these two doctors to break the law, correct?

A We told her to use her judgment. Not to be as persuasive as possible.

Q So, in other words, when she testified to that yesterday, you disagree with her?

A Her training may point her in that direction, but that's not a specific instruction that myself or any other agent on my squad said, be persuasive in the nature to attain these records.

Q But your goal was to get them to break the law?

A Our goal was to see if they were willing to cross that threshold line.

Q So if they had not provided them, you wouldn't have charged them?

A We would not have charged them with a direct HIPAA violation, no. [Tr. 5/25/23 at 105-06.]

**6. The UC minimized the importance of the requested medical records and appealed to Defendants' humanitarian motives as part of her attempt to persuade Defendants to violate HIPAA.**

The UC admitted that she was instructed to be persuasive when asking

Defendants to violate HIPAA, and she tried to be:

Q Right. Okay. Now, the case agent told you: Use your
judgment about how to ask in the way that will be most
persuasive, correct?
A Yes. [Tr. 5/24/23 at 87.]

. . .

Q Okay. So what I was talking about was the instructions
you got were to use your judgment about how to ask it --
A Yes.
Q -- in a way that would be most persuasive, correct?
A Yes.
Q And the way you executed that general direction was to say
to Dr. Gabrielian, "The patients don't have to be important at
all," correct?
A Yes. I was trying to minimize the, kind of, I guess
significance of that, which is one of the tactics that law
enforcement utilizes in their methods, investigative methods.[4]
Q Right.
A To include undercover operations.
Q Right. And you also said to be persuasive?
A What do you mean?
Q When you were asking, you agreed you were trying to be
persuasive, to get her to do it; correct?
A Yes. And I asked --
Q Ma'am, can I please ask you to just answer my questions?
A Sure.
Q Thank you. So as another way of being persuasive, you
said, "The records don't have to be detailed at all," correct?
A Yes, I mentioned that.
Q And you said, "They don't even have to be a person you're
currently treating," correct?
A Correct. [Tr. 5/24/23 at 88-89.]

---

[4] Government counsel tried to walk back the UC's admission on redirect. Tr. 5/25/23
at 22-23, suggesting that defense counsel had used the words "most persuasive," not
the UC. But that's the way cross-examination works. As the transcript reflects, the
UC readily and repeatedly agreed that she had been instructed to be persuasive,
and she was trying to be persuasive. The UC volunteered that she had used
recognized "law enforcement techniques" to minimize the importance of the
requested patient records.

Even before the Government conceived of asking Defendants to violate HIPAA, during meeting 3 the UC encouraged Defendants to believe that her superiors would be receptive to the offers of medical assistance and technology:

> AG: [OV] But this is how you get people out of—
> UC: [OV] Mm-hmm.
> AG: —hospitals and you divert the resources to better things. And better things, on both sides, are soldiers, who are—
> UC: [OV] Mm-hmm. So I-I understand this part, of-of um— definite value and what we can get from it—
> JH: [OV] Yeah.
> UC: —and I cannot imagine that they would, like, not take you up on this offer, but— [GX 6 at 120.]

Dr. Gabrielian described medical programs that could save lives, and showed the UC medical articles and information on her cell phone. The UC feigned interest and even took a picture of one article. [GX 6 at 105, 115, 116-17, 144 148.]  In meeting 4, when the UC was trying to persuade Dr. Gabrielian to bring her a few unimportant medical records, the UC said that her superiors understood that Dr. Henry wanted "to help in a humanitarian way." [GX 6 at 205.]

There is only reasonable inference to draw from these exchanges—the UC encouraged Defendants to believe that Russian intelligence would be receptive to offers of medical assistance and technology if Defendants passed the loyalty test.

### 7. How could Defendants have been "ready and willing" to commit a crime no one had even conceived of until Government counsel "found an offense" under HIPAA?

Defendants' innocuous emails to the Russian embassy and a Moscow medical school did not mention sharing patient records. Dr. Gabrielian did not offer to share

patient records in her call to the Russian embassy. Defendants' text exchanges didn't

mention offering patient records to the Russian embassy.

FBI Agent Walker's testimony admitted the implausibility of a HIPAA

espionage case:

> You mentioned that in your national security training, you
> had never received training about HIPAA, correct?
> A Correct.
> Q In that training, they had never suggested a scenario
> where an American doctor would be knocking on the door of
> Russian intelligence and saying: You know, I've got a couple
> random patient records from folks, like maybe the wife of a
> government employee. This is really important for Russia. How
> much are you going to pay me for them?
> You didn't run across that scenario in your training, did
> you?
> A No. In those scenarios, they teach you to be very
> open-minded because everything happens.
> Q You never read a spy novel with that scenario either, did
> you?
> A With medical records?
> Q Yeah.
> A No.
> Q Never saw a spy movie about it either, did you?
> A No.
> Q Right. And you had no inkling, when this investigation
> began, about investigating a possibility of some American
> citizen turning over a few random patient records to Russian
> intelligence, did you?
> A Did I have an inkling?
> Q Yes.
> A No, we did not. [Tr. 5/25/23 at 86-7.]
>
>                                          . . .
>
> Q It's also true, if I understand your direct or maybe even
> cross from Mr. Mead, that you have never in the course of
> investigating national security concerns, investigated a HIPAA
> claim; is that right?
> A Correct.
> Q Because it really doesn't fit within the national security

rubric; is that right?
A Correct. [Tr. 5/25/23 at 116.]

Dr. Gabrielian agreed with Agent Walker:

> Q Before the undercover approached you on August 17, 2022,
> would it ever have occurred to you to go knock on the door of
> the Russian embassy and say, "Hey, I've got two medical records
> of patients with detached retinas. They're somehow associated
> with government employment. Aren't you guys interested in
> this?"
> A No, I think that idea is absurd.
> Q So you did not have that intent?
> A No. [Tr. 5/25/23 at 139.]

Sheer improbability weighs heavily against concluding beyond a reasonable doubt that Defendants were ready and willing to commit the bizarre crime that the Government conceived and induced.

> **8.     Defendants were not "positionally predisposed;" the
>         Government failed to prove a scenario where
>         Defendants could be offered a real world, non-
>         threatening "favorable opportunity" to commit the
>         <u>charged offenses.</u>**

"A person is not entrapped when that person has a previous intent or disposition or willingness to commit the crime charged and law enforcement officers **merely provide what appears to be a favorable opportunity** to commit the offense." [Court's final condensed jury instructions at 26 (emphasis added).] The Court's supplemental entrapment instruction repeated that the Government had to prove Defendants were "merely . . . awaiting a favorable opportunity."

The "favorable opportunity" language reflects the fundamental rationale for the entrapment defense. As Judge Posner wrote:

> A person who is likely to commit a particular type of crime without being
> induced to do so by government agents, although he would not have

34

committed it when he did but for that inducement, is a menace to society and a proper target of law enforcement. The likelihood that he has committed this type of crime in the past or will do so in the future is great, and by arranging for him to commit it now, in circumstances that enable the government to apprehend and convict him, the government punishes or prevents real criminal activity. The government's inducement affects the timing of the offense; it does not create the offense by exploiting the susceptibility of a weak-minded person. The defense of entrapment reflects the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character.

*United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir. 1994)(*en banc*).

In *Hollingsworth,* the *en banc* Seventh Circuit adopted a "positional predisposition" requirement, holding:

> [p]redisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has positional as well as dispositional force. . . . The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation. A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales. For these and other traditional targets of stings all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed. It is different when the defendant is not in a position without the government's help to become involved in illegal activity.

27 F.3d at 1200.

*Hollingsworth* found entrapment as a matter of law and reversed money laundering convictions for two hapless businessmen who were in no realistic position to commit the charged offenses without government inducement. Judge Posner's *Hollingsworth* opinion relied on a close reading of *Jacobson v. United States,* 503 U.S.

540 (1992), where the Supreme Court found entrapment as a matter of law and reversed the child pornography conviction of a "56-year-old veteran-turned farmer who supported his elderly father in Nebraska." 503 U.S. at 542.

The government identified Jacobson as a potential target because he had ordered two nudist magazines with photos of young boys before Congress criminalized receiving child porn through the mails. After Congress criminalized receiving child porn, the Postal Service occasionally sent Jacobson mailings over two years from fake organizations advocating First Amendment freedoms for sex with minors. An undercover pen pal solicited Jacobson's sexual interests; he responded with an interest in young men in their late teens and early 20s, then discontinued the correspondence. The Customs service sent Jacobson a brochure advertising pictures of young boys engaging in sex. Jacobson placed an order, but Customs did not fill it. The Postal Service ran another sting offering information about pornography, requiring Jacobson to certify that he was not a law enforcement officer. Jacobson made the certification, asked for the information, received a catalog, and ordered "Boys Who Love Boys." 503 U.S. at 542-47.

The Supreme Court conceded that Jacobson was predisposed by the time he received the last catalog in 1987, but held, "it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January, 1985." 503 U.S. at 550, *citing Sorrells v. United States,* 287 U.S. 435, 442 (1932); *Sherman v. United States,* 356 U.S. 369, 372 (1958). The Court held that Jacobson's earlier

purchase of nudist magazines was insufficient to sustain a finding of predisposition:
"It may indicate a predisposition to view sexually oriented photographs that are
responsive to his sexual tastes; but evidence that merely indicates a generic
inclination to act within a broad range, not all of which is criminal, is of little
probative value in establishing predisposition." *Id.*

Judge Posner found a "positional predisposition" requirement from *Jacobson*
because:

> had the Court in *Jacobson* believed that the legal concept of
> predisposition is exhausted in the demonstrated willingness of the
> defendant to commit the crime without threats or promises by the
> government, then Jacobson was predisposed, in which event the Court's
> reversal of his conviction would be difficult to explain. The government
> did not offer Jacobson any inducements to buy pornographic magazines
> or threaten him with harm if he failed to buy them. It was not as if the
> government had had to badger Jacobson for 26 months in order to
> overcome his resistance to committing a crime. He *never* resisted.

*Hollingsworth,* 27 F.3d at 1199 (emphasis added).

The Fourth Circuit has not expressly rejected or adopted *Hollingsworth's*
"positional predisposition" requirement. In *United States v. Squillacote,* the Fourth
Circuit expressed skepticism, noted that the Ninth Circuit had rejected positional
predisposition, and affirmed refusal of a requested "positional predisposition" jury
instruction on the facts. 221 F.3d 542, 567 (4th Cir. 2000).  While Defendants ask this
Court to adopt *Hollingsworth* and find entrapment as a matter of law on that basis,
it is not necessary to go so far as to adopt "positional predisposition." Judge Posner
was right that a real-world possibility that a defendant will have a favorable
opportunity to commit the crime without Government inducement is critical in

identifying "[a] person who is likely to commit a particular type of crime without being induced to do so by government agents." *Hollingsworth*, 27 F.3d at 1203.  That's what the "favorable opportunity" language is all about.

Even without a "positional predisposition" requirement, the Government failed to prove a realistic possibility that Defendants would ever have had a "favorable opportunity" to commit the charged crimes without Government inducement. How would a real-world "favorable opportunity" ever arise for the bizarre crime that the Government conceived and induced?

The interactions with the UC show that Defendants had not made any further overtures to Russia. [GX 6 at 2, 28, 30, 81, 166.] There was nothing in the pre-August 17 evidence to suggest that Defendants ever considered providing patient records to Russia. Accordingly, there is no reasonable inference that Defendants would have volunteered to provide patient records to Russia sometime in the future. And if the Russians did not respond to Dr. Gabrielian's March 1 email and call for over five months, there is no reasonable inference that Russian intelligence would ever have approached Defendants.

Even if Russian intelligence had responded to Defendants at some point in the future, the  Government introduced no evidence that Russian intelligence has ever asked an American doctor for medical records of her patients. And the Government introduced no evidence that such an overture would have been a "merely . . . favorable opportunity." As FBI Agent Walker admitted:

> Q. So, again, one of your jobs in counterintelligence is to protect American citizens from approaches by Russian intelligence, correct?"

A.  Correct."
Q. Because you know those people are dangerous, correct?
A. They are.
Q. They lie, correct?"
A. They do.
Q. They use blackmail, correct?
A. Open source, yes. I've seen that before, yes. [Tr. 5/25/23 at 68.]

In sum, the Government offered no evidence of any real-world likelihood that Defendants would ever have been offered a "favorable opportunity" to commit the crimes charged, or that they would have agreed to do so in response.

> **9.    This record of entrapment is far stronger than the facts in *Sherman* and *Jacobson,* where the Supreme Court found entrapment as a matter of law.**

As described above, the Supreme Court found entrapment as a matter of law in *Jacobson v. United* States. Jacobson had ordered nudist magazines with photos of young boys before the first Government contacts. After receiving fake Government mailings advocating First Amendment freedoms for sex with minors, Jacobson twice ordered child pornography promptly when the Government sent him catalogs.

The Supreme Court also found entrapment as a matter of law in *Sherman v. United States,* 356 U.S. 369 (1958). Sherman had a 1942 conviction for selling narcotics and a 1946 possession conviction. In 1951, Sherman had several chance encounters with an informant as they were both seeking medical treatment to cure drug addiction. The informant said he was not responding to treatment, and asked Sherman to get him narcotics. "From the first, petitioner tried to avoid the issue. Not until a number of repetitions of the request, predicated on [the informant's] presumed suffering, did petitioner finally acquiesce." 356 U.S. at 371. After a few sales, the informant arranged to have Government agents observe three more. The Government

39

searched Sherman's apartment and found nothing. The Court noted "There is no significant evidence that petitioner even made a profit . . ." 356 U.S. at 371, 373-74,

Neither *Sherman* nor *Jacobson* involved threats or fear for personal safety, or a Government argument that the evidence was sufficient to prove that Defendants "did it to [avoid] any harm to [them] or their family."[5] In combination with that admission, the following factors also establish entrapment as a matter of law and demonstrate entrapment far more strongly than the facts in *Sherman* and *Jacobson*:

1. Undisputed contemporaneous evidence demonstrated that before the UC approach, Defendants disapproved of Russia's invasion and wanted to provide humanitarian aid to both sides in the Russian/Ukrainian war.

2. The undercover tapes confirmed Defendants' intent to provide medical assistance to Russia. Sherman's sympathy for a fellow addict's suffering does involve humanitarian aims of a lesser degree; Jacobson's desire for child pornography was hardly mixed with a humanitarian purpose.

3. The Government had no predisposition evidence before the first UC contact on August 17. Sherman had a previous conviction for narcotics distribution and was a recovering addict; Jacobson had previously bought and still possessed nudist magazines with pictures of naked boys.

4. Defendants repeatedly expressed reluctance to violate HIPAA. The Supreme Court emphasized that Sherman was reluctant at first. 356 U.S. at 373. Jacobson twice promptly ordered child pornography when the Government sent him catalogs.

---

[5] Courts recognize threats and safety concerns as relevant to an entrapment defense. *See United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994) ( "Courts have found a basis for sending the entrapment issue to the jury (or finding entrapment established as a matter of law) where government officials: (1) used 'intimidation' and 'threats' against a defendant's family, *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir.1993)"); *United States v. Hunt*, 749 F.2d 1078, 1086 (4th Cir. 1984)(Defendants' fear of withdrawal from bribery scheme where agents purported to be working with drug dealers considered, but rejected as part of analysis finding no entrapment as matter of law); *United States v. Edwards*, 139 F.3d 894 (Appx.) (4th Cir. 1998)(considering but rejecting defendant's argument that her fear of co-conspirator entitled her to entrapment defense).

5. After meeting 3, the UC reported Defendants denied access to classified information; Government counsel identified a 10-year felony that would fit, and decided to solicit an improbable crime. *Sherman* and *Jacobson* also involved inducement, but for routine crimes.

6. The UC minimized the importance of the requested medical records and appealed to Defendants' humanitarian motives as part of her attempt to persuade Defendants to violate HIPAA. Government appeals to non-criminal motives clearly offended the Supreme Court in *Sherman* (fellow addict's suffering) and *Jacobson* (appeals to First Amendment, albeit in dubious circumstances). *See also, Sorrells,* 287 U.S. at 441 (appeals to provide whiskey to fellow World War I veteran); *United States v. Hsu,* 364 F.3d 192, 201 (4th Cir. 2004), *citing United States v. Gendron,* 18 F.3d 955, 961 (1st Cir. 1994).

7. Neither the Government nor Defendants conceived of providing medical records to Russian intelligence before the first UC contact; the Government induced a crime that was unprecedented and utterly improbable. The drug distribution and child pornography offenses in *Sherman* and *Jacobson* are well-known crimes, often the subject of undercover operations.

8. Defendants were not "positionally predisposed;" the Government failed to prove a scenario where Defendants could be offered a real world, non-threatening "favorable opportunity" to commit the charged offenses. Sherman and Jacobson were both positionally predisposed, subject to real world opportunities and temptations to commit the charged offenses.

In sum, the record establishes entrapment as a matter of law.

## II. THE EVIDENCE SHOWED THAT THE GOVERNMENT'S FUTURE "PERSONAL GAIN" THEORY VIOLATED RULES OF STATUTORY INTERPRETATION, FAILED TO ESTABLISH THE REQUIRED SPECIFIC INTENT, AND WOULD MAKE THE STATUTE VOID FOR VAGUENESS AS APPLIED.

In opening statement, Government counsel described Defendants' intent in

turning over unimportant patient records:

> You'll see and hear that the defendants were providing this information to show their access, their willingness to access information and the type of information and the kind of information they could provide to Russia and how they were, in Dr. Gabrielian's words, useful long-term weapons. [Tr. 5/23/23 at 29-30.]

41

In closing, Government counsel argued that Defendants intended "personal gain" by building a relationship with Russian intelligence that could lead to benign purposes:

> The personal gain takes a couple of different tacks, most primarily in having been provided to forge the relationship that the two defendants had hoped to develop with the Russian government. To forge that relationship, cement it for future long-term exploitation. [Tr. 5/30 at 11.]
>
> . . .
>
> The objectives in the context of personal gain are not mutually exclusive. They could have been, again, simply as I earlier alluded to in terms of the motives, the objectives or the intent is not mutually exclusive. It could have been both of those things, to appease the KGB as well as to help develop this relationship. Because after all, according to Dr. Gabrielian, she actually expected this was going to be the vector through which she would provide other assistance to the Russian government. And indeed, that other assistance may well have been of a more benign nature. It may have been more things like medical studies, [Tr. 5/30/23 at 12-13.]

In other words, the Government's theory was that Defendants intended to make a good impression so that they might "gain" in the future, and that future "gain" could have been the opportunity to provide humanitarian medical assistance. This "future gain" theory confused motive for intent, and did not meet the Court's requirement for specific intent. The Court instructed the jury:

> `"Personal gain" means that the action is done to gain a substantial advantage. Personal gain need not be monetary.
>
> I previously instructed you that proof of motive does not establish guilt, nor does a lack of proof of motive establish that a defendant is not guilty. In considering whether the Government has proved that Defendants made unauthorized disclosures for malicious harm or personal gain as charged in Counts 2-9, or whether the Defendants conspired to make such disclosures as charged in Count 1, it is important to distinguish motive from intent. Motive is what prompts a person to act or fail to act. In contrast, intent refers only to the state of mind with

which the act is done or omitted. The distinction is one of immediacy—
not in a temporal sense, but in the sense of the defendant's purposes.

In this case, the violations of HIPAA charged by the Government
require a specific intent, that is, that the Defendants disclosed patient
health information "with intent to sell, transfer, or use [that]
information for . . . personal gain[] or malicious harm." The question,
then, is whether the defendants consciously sought to achieve personal
gain or cause malicious harm when they allegedly disclosed the patient
health information described in the indictment. The Government cannot
meet its burden of proof in this case by asserting that Defendants
intended malicious harm or personal gain from anything but
unauthorized disclosures of individual patient medical information.

The Government's "future gain" theory did not meet this test of "immediacy."
The Government's arguments conceded that Defendants did not intend to benefit
from turning over medical records at the time, but hoped to pass a loyalty test that
might lead to speculative future "gain." The Government did not introduce any
evidence of what that future gain might be, and never attempted to argue or specify
what Defendants would actually gain from a relationship with Russian intelligence
in the future. The Government's arguments added the unconstitutionally vague
concept that "personal gain" could mean the psychic benefit from performing
humanitarian medical services.

Even though the Court rejected Defendants' contentions that "personal gain"
requires some pecuniary benefit,[6] the Government's "future gain" theory stretches
HIPAA's felony provisions beyond any recognizable limits. "It is linguistically *possible*
to understand 'private gain' as whatever adds to the employee's income or psyche –
anything the employee would pay to have, rather than pay to avoid – but the Rule of

---

[6] *See* Briefing Regarding Instruction No. 31: "Malicious Harm" and "Personal Gain,"
ECF. 90. Defendants re-assert those arguments by reference here.

Lenity counsels us not to read criminal statutes for everything they can be worth."
*United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007).

In the absence of unambiguous statutory language or contrary legislative intent, the rule of lenity requires this Court to construe the statute narrowly. *See United States v. Hilton*, 701 F.3d 959, 968 (4th Cir. 2013) ("[T]he rule of lenity requires that, '[w]hen a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require Congress should have spoken in language that is clear and definite.'") (citing *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.d3 199, 206 (4th Cir. 2012) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22 (1952))).

The rule of lenity requires this Court to find that the felony provision's "personal gain" requirement does not include an intent to build a relationship that might lead to a future "personal gain" independent of the immediate HIPAA violations at issue. The Court should also hold that "personal gain" does not include the psychic benefit from providing charitable or humanitarian assistance, or from assisting another country out of patriotism or loyalty. Construing the statute to include the Government's theory of speculative personal gain would make the statute void for vagueness as applied to Defendants.

The "void-for-vagueness" doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and

44

discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)(citations omitted). The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *United States. v. Davis*, 139 S. Ct. 2319, 2325 (2019). "Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Id*.

Vagueness concerns are intensified where a statute imposes criminal penalties.[7] A statute is unconstitutionally overbroad where, as here, it risks including within its prohibition fully lawful conduct undertaken in good-faith, or because of the uncertainty of the definition of material terms, or because a recognized justification defense motivated the conduct.

If the term "personal gain" includes avoiding personal harm or the opportunity to provide humanitarian medical assistance, the statute would be unconstitutionally overbroad as applied because it would capture within its ambit legal and justifiable conduct. The statute would also be void for vagueness because the key phrase "personal gain" would give insufficient notice as to what constitutes the crime charged.

---

[7] *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has … expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

For all these reasons, the Court should enter judgments of acquittal on the Government's theories of personal gain by building a relationship with Russian intelligence.

### III.   GOVERNMENT PROOF OF INTENT TO "MALICIOUSLY HARM" THE UNITED STATES WAS INSUFFICIENT AND SPECULATIVE.

#### A.   Dr. Henry Did Not Join A Conspiracy To Provide Medical Records Of Important Political Figures.

In meeting 2, alone with Dr. Gabrielian, the UC repeatedly pressed for special or secret or confidential information. Fearing that she couldn't give a firm no to a representative of Russian intelligence, Dr. Gabrielian made statements that even though it would mean she would lose her freedom, family, and career, she might disclose the medical records of important political figures to Russia if "it would somehow radically change the situation." [GX 6 at 70.]  Dr. Gabrielian repeatedly said that she and Dr. Henry would get caught and be fired if they accessed important patient records, and that patient records would be useless anyway. [GX 6 at 70-75.] Dr. Henry was not present for those conversations.

Later in the evening of August 17, Dr. Henry joined Dr. Gabrielian and the UC for meeting 3.  Dr. Gabrielian again emphasized that she and Dr. Henry would be caught immediately if they tried to access medical records of an important person. [GX 6 at 113-14.] Later in meeting 3, the UC interrupted Dr. Gabrielian's attempt to describe life-saving anesthesia innovations by asking again about Dr. Henry's continuing computer access in the next two weeks before his anticipated departure from the Army. That led Dr. Gabrielian to make statements about being a "long-term weapon" and "los[ing] an Army doctor" in an attempt to persuade the UC that Russian

intelligence should not ask for patient records from an important person. Dr. Gabrielian indisputably said that if that happened, Defendants would likely lose their jobs, risk going to jail, and be of no further value to Russian intelligence. [GX 6 at 120-25.]

In isolation, this passage may support an inference that Dr. Gabrielian might reluctantly provide medical records sometime in the future for a hypothetical important figure *if* the UC requested them, *if* Dr. Gabrielian had access, and *if* it was "awesomely important." The UC said several times that she would not put Defendants' careers at risk, and could not imagine requesting records for an important political figure unless it was a "life-changing situation." [GX 6 at 120-25.] The UC also said that she would not request records for ordinary patients. [Tr. 5/25/23 at 85.] Meeting 3 ended without the UC requesting medical records of any kind, and without Defendants offering to do anything to access them.

Meeting 4 between the UC and Dr. Gabrielian alone clearly established that Dr. Henry had not yet agreed to join a conspiracy to violate HIPAA. Dr. Gabrielian asked what would happen if Dr. Henry refused to violate HIPAA. Dr. Gabrielian said "It's 70 to 30 that he will not want to do it." [GX 6 at 211, 217.]  In order to be persuasive, the UC asked for unimportant medical records:

> Q Okay. So what I was talking about was the instructions
> you got were to use your judgment about how to ask it --
> A Yes.
> Q -- in a way that would be most persuasive, correct?
> A Yes.
> Q And the way you executed that general direction was to say
> to Dr. Gabrielian, "The patients don't have to be important at
> all," correct?

A Yes. I was trying to minimize the, kind of, I guess
significance of that, which is one of the tactics that law
enforcement utilizes in their methods, investigative methods. [Tr.
5/24/23 at 88-89.]

In meeting 5, both Defendants provided medical records for ordinary patients,
not important political figures. Dr. Gabrielian again said that she could not access
records of patients she did not treat without getting caught, and it was impossible to
plan which patients she might treat on a particular day where she could get access.
[GX 6 at 277-78.] Meeting 5 ended without the UC asking for records of important
political figures.

In conclusion, the Government entrapped Defendants into providing a few
medical records of ordinary patients. The UC never asked Defendants to access the
medical records of an important political figure, and Defendants never attempted to
do so. Defendants did no overt acts in furtherance of a conspiracy to specifically access
the medical records of any important political figures. Dr. Henry did not agree to
provide medical records for an important political figure.

Finally, any alleged agreement to provide medical records for important
political figures in the future would have been utterly speculative. The Government
introduced no evidence that either Defendant would actually have access to the
records of important political figures in the future.

**B.    The Evidence Was Insufficient To Establish That Defendants Intended "Malicious Harm" To The United States By Providing IHII Of Ordinary Patients With Vague Connections To <u>Government Employment.</u>**

The Government's only *proof* that disclosing medical records of important political figures would harm the United States was the case agent's testimony, over an overruled hearsay objection, saying "medical information has been—open source publication, has been a focal point for intelligence services, particularly at high level leadership positions like the president." [Tr. 5/25/23 at130-31.] Dr. Gabrielian assumed in conversations with the UC that she would be fired and could go to jail for accessing such information, but she never said anything to show an understanding about how such records could actually "harm the United States," whatever that unconstitutionally vague term means.

When it came to the crime that it induced, disclosing IHII of ordinary patients, the Government never articulated a coherent theory of malicious harm,  other than vague generalizations about "helping Russia." "Obviously our suggestion in this case is the malicious harm was in the course of aiding Russia doing something contrary to the interests of the United States to hurt the foreign policy interests of the United States in benefiting Russia." [Tr. 5/30/23 at 11 (Government closing)]. How would accessing a few routine medical records of ordinary patients "hurt the foreign policy interests of the United States in benefitting Russia?" This formulation confirms that the Government's limitless interpretation of "malicious harm to the United States" renders the statute void for vagueness as applied to these Defendants.

The Government argued that Defendants understood that personal information in the IHII would make it easier for Russian intelligence to "turn" or blackmail the patients involved, just as the UC's knowledge about Dr. Gabrielian's family made it possible for Russian intelligence to pressure Dr. Gabrielian. [Tr. 6/30/23 at 35 (government rebuttal close)].Under this absurd logic, the LinkedIn and Facebook accounts of government employees and their families make them vulnerable to Russian intelligence. The Government's argument is also a false equivalence. It was not just any family or personal history that made Dr. Gabrielian vulnerable—it was that she had family living in Russia, and that Russian intelligence appeared to have devoted considerable resources to pressing her for confidential information.

The Government emphasized that Dr. Gabrielian showed the UC "selected" medical records for two Hopkins patients, N.Z. and A.R.  Dr. Gabrielian selected those two patients because the UC had asked Defendants to demonstrate their access to the medical records of  government or military personnel as a loyalty test. But there was no actual evidence that Dr. Gabrielian selected those patients because information in their medical records somehow made them "turnable."

The parties stipulated that "N.Z.'s spouse is employed by the Office of Naval Intelligence." But Dr. Gabrielian didn't know that. Dr. Gabrielian told the UC, "she says that her husband was in some kind of services—but who knows if the husband was really in?" [GX 6 at 259.] The UC spent substantial time in meeting 5 looking at

N.Z.'s medical record and taking notes. N.Z. was treated for a detached retina—there was absolutely nothing of interest in her medical records. [GX 6 at 258—80.]

The parties stipulated that the second Hopkins patient, A.R., "is a veteran of the U.S. Air Force who worked as a civilian in the Secretary of Defense until his retirement in 2019." Dr. Gabrielian told the UC that A.R. was retired Air Force, "Active duty don't come to us." [GX 6 at 280.] The UC noted a list of A.R.'s medications, which included bupropion.

> UC: [OV] And with regard to *med-medication*, what *medication* did they give him?
> [noises]
> AG: This is all *ophthalmi-ophthalmic solutions.*
> UC: Uh-huh . . . floxin, erythromycin . . . [noise] Oh, that one I know— erythromycin. [intermittent noises] *Triamterene, sumatriptan* [PH]*, bupropion* . . .
> AG: [OV, UI] depression . . .
> UC: [UI]
> AG: [OV] . . .but not a bad one.
> UC: It's—it's which one? This one—
> AG: Yes.
> UC: —where it shows that he has depression?
> AG: Uh-huh.
> UC: Uh-huh. *Bupo-buprorion [sic]? Uh-huh.*
> AG: It could be for a lot of things . . . even those who want to stop smoking, sometimes. [GX 6 at 285.]

In rebuttal close, Government counsel seized on the reference to bupropion and mischaracterized what Dr. Gabrielian said:

> Or let's say someone has depression, as was the case in the medical record that Dr. Henry -- Dr. Gabrielian flagged; she actually says, "Look here, this person has depression" as they go through. Well, of course it's important in the context of a foreign intelligence agency to know if people have and are battling -- being treated for various mental health issues because it tells you who they might or might not be willing or able to approach. It's dangerous to provide that information to the

Russian government. It's not useless information like Mr. Mead says. It's, in fact, very useful information. [Tr. 5/30/23 at 41.]

As Dr. Gabrielian actually said, bupropion is approved "for a lot of things," including mild depression. "The drug is FDA-approved for adult depression, seasonal affective disorder, and smoking cessation. Off-label, non-FDA approved uses include anti-depressant-induced sexual dysfunction, attention-deficit/hyperactivity disorder (ADHD), depression associated with bipolar disorder, and obesity." NIH Library of Medicine: https://www.ncbi.nlm.nih.gov/books/NBK470212/#:~:text=Bupropion %20is%20an%20antidepressant%20medication,affective%20disorder%2C%20and%2 0smoking%20cessation. To suggest that Dr. Gabrielian believed that a prescription for bupropion would cause Russian intelligence to covertly recruit an Air Force retiree, or make A.R. more likely to become a spy, is not worthy of the Department of Justice. This desperate theory cannot support guilt beyond a reasonable doubt on Count Two, the count related to A.R.

The remaining substantive counts are even worse. For Count Three, there was nothing in N.Z.'s medical record to suggest that she or her husband were "turnable." Counts 4-9 relate to notes from Dr. Henry's green notebook. He did not "select" those patients. The UC leafed through his notebook and took photographs of utterly unimportant notes. [GX 6 at 289-328.] Again, there is nothing in the medical records themselves to support a reasonable inference that Dr. Henry believed that providing those records would "maliciously harm" "the foreign policy interests of the United States in benefiting Russia."

**C.      Even A *Motive* To Harm The United States Cannot Support Specific *Intent* To Harm By Disclosing Medical Records.**

The Government's vague argument that Defendants intended to harm the United States by helping Russia "mistakes motive for intent." *See United States v. Walli*, 785 F.3d 1080, 1088 (6th Cir. 2015). Even that vague, generalized motive could not have been their specific "intent" in disclosing several inconsequential scraps of medical records.

As the Sixth Circuit explained in *Walli*:

> "Motive is what prompts a person to act or fail to act." *United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011)). In contract, "[i]ntent refers only to the state of mind with which the act is done or omitted." *Id*. The distinction is one of immediacy – not in a temporal sense, but in the sense of the defendant's purposes.

*Id*.

The defendants in *Walli* were convicted under 18 U.S.C. § 2155(a) for committing acts that "injure[d]. . . [a] national defense premises" "with intent to. . . interfere with. . . the national defense." *Id*. Defendants committed damaging acts of vandalism at a military facility used to manufacture components for nuclear weapons, test the reliability of the components, and store enriched uranium. One of the questions on appeal was whether "defendants consciously meant to interfere with the nation's ability to attack or defend." The Sixth Circuit found that no rational jury could find the defendants had the requisite intent, because the acts of vandalism could not realistically "interfere with . . . the national defense."

The Government's theory of "malicious harm" against the United States has the same flaw. No rational juror could find that Defendants *intended* specific harm to

the United States from the disclosure of unimportant medical records. As the evidence clearly shows, the UC and Defendants viewed disclosing the records as a loyalty test. There is not "substantial" evidence indicating Dr. Gabrielian and Dr. Henry specifically intended "malicious harm" to the United States by disclosing a few unimportant medical records.

## CONCLUSION

For all these reasons, the Court should enter a judgment of acquittal on all counts and dismiss the Superseding Indictment.

Respectfully submitted,

SCHERTLER ONORATO MEAD & SEARS, LLP

/s/ *Christopher B. Mead*
Christopher B. Mead, Bar No. 08661
Noah Cherry, PRO HAC VICE
555 Thirteen Street, NW
Suite 500 West
Washington, DC 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
cmead@schertlerlaw.com
ncherry@schertlerlaw.com

*Counsel for Anna Gabrielian*

DAVID WALSH-LITTLE, #23586

/s/ *David Walsh-Little*
The Law Office of David Walsh-Little, LLC
1014 West 36th Street
Baltimore, Md 21211
Tel: 1.410.205.9337
Fax: 1.667.401.2414
Email: david@walshlittlelaw.com

*Counsel for Jamie Lee Henry*

54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2023, a true and correct copy of the foregoing was electronically filed and served on counsel of record through ECF.

<u>/s/ Christopher B. Mead</u>