IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | CRIMINAL NO.  1:22-336-SAG |
| | * | |
| ANNA GABRIELIAN and | * | |
| JAMIE LEE HENRY, | * | |
| Defendants. | * | |

..........

### DR. ANNA GABRIELIAN'S STATUS REPORT AND REQUEST FOR HEARING

On November 13, 2023, the Court held a Pretrial Conference and Motions Hearing in advance of a then-scheduled November 28, 2023, trial date. During the hearing, the Government opposed several of Defendants' motions in limine, arguing that, among other things, it should be able to have its agent testify about open-source information. Government counsel said they could not acknowledge whether potentially exculpatory evidence existed because Defendants had previously declined to engage in the CIPA process. In response, the Court gave Defendants 24 hours to decide whether they would pursue CIPA. Although Defendants lives have been on hold since September 2022 and they are desperate to exonerate themselves at trial, they reluctantly decided to postpone trial and engage in the CIPA process. In the five months since that hearing, the Government has not performed even the initial step of requesting clearances, and now indicates that it has no intention of doing so.

Dr. Gabrielian respectfully requests a hearing for the Court to help resolve this impasse.

## RELEVANT BACKGROUND

During the original May 2023 trial, Defendants objected to certain Government evidence and argument that Defendants viewed as inadmissible and highly prejudicial. On October 9, 2023, in advance of a second trial, Defendants moved to preclude the Government from again introducing what it continues to view as inappropriate evidence and argument. Relevant to this status report, the Defendants filed the following motions in limine:

- Motion to Exclude Argument and Cross Examination that Medical Records of Important U.S. Political Figures are Targets of Covert Russian Intelligence.

- Motion to Exclude Argument and Cross Examination that Personal Details in Medical Records of U.S. Nationals Made Patients "Turnable" by Russian Intelligence.

- Motion to Exclude Argument and Cross Examination that it was unreasonable for Defendants to Believe that Russian Intelligence Might Retaliate Against Them or Their Family Members.

The Court heard argument on these motions, and others, at the November 13, 2023 pretrial conference and motions hearing. Throughout the hearing, the Government insisted on making the above contested arguments at trial. Government counsel repeatedly referred to Defendants' decision to not pursue CIPA as the reason,

2

for among other things, why its witnesses should be able to testify about "open source" information (as some sort of compromise that Defendants never consented to). Government counsel said that Defendants' failure to engage in the CIPA process meant that the Government could not acknowledge whether potentially exculpatory evidence existed, or that it had no classified information that would support its arguments.

For example, there was the following exchange regarding Agent Walker's prior testimony that, according to "open source" information, foreign adversaries are seeking medical records of important individuals:

> **AUSA ZELINSKY:** This is not a CIPA proceeding at this point so I won't use the term sanitized, but that will enable us to navigate the shoals. We are willing to stipulate that there are open source reports that indicate that. That is, if there's a concern that when it comes from an FBI agent, it's somehow given imprimatur or something, we can stipulate with the defense that there are open source reports or public reporting that indicates that foreign governments seek medical records. We don't disagree with any of that.
>
> But, yes, to the extent that the argument from the defense is "Well, we haven't seen evidence that medical records are a target of foreign intelligence services, and we would like information as to why medical records of individuals are targets of foreign intelligence services," *that sort of is a core CIPA matter*, right? "We want to know what do you know about what foreign intelligence services know," and *that's right at the core of CIPA.*
>
> **THE COURT:** Mr. Mead.
>
> **MR. MEAD:** So, Your Honor, this is concerning on a number of levels. I would need to talk to my client separately before I can make any commitment, but I think the Government is missing a nuance or the real core of my argument.
>
> Open source information about whether foreign intelligence services seek the medical records of important American political

figures as an active, ongoing intelligence thing aren't reliable, frankly. I mean, an open source to that effect. Unlike open source information which is relevant to our client's state of mind, in other words, hearsay about Russian intelligence killing people is relevant not for the truth of the matter asserted -- though I have no doubt about its truth -- but it is relevant to the state of mind and the fear of our clients.

So here's the problem. I am deeply skeptical. I don't have a security clearance, I've never worked in national intelligence or whatever else. But I have to tell you I am deeply skeptical about the notion that Russian intelligence has to invest any covert resources in trying to find information about the medical conditions of American politicians, in part, because there is so much publicly available information and, in part, because it's not very helpful to anything they're doing.

So that skepticism leads me to say I don't want an FBI agent or a stipulation about open source stuff. If the Government is -- if the Department of Justice is going to take the position "Hey, there is classified information to overcome your skepticism, Chris. It actually happens all the time, and we are prepared to introduce that in court to prove that that's important," I think we're entitled to challenge that, review the information, and I'd have to talk to my client at this stage about whether she really wants to waive that right to review. That's a hard decision.

**THE COURT:** Why don't we do that now then because that's relevant to whether we can go to trial on the 28th. Assuming that you -- what Mr. Zelinsky is telling us is he can't tell you right now whether they've got that information or not because, again, we're getting into classified information, but if you want that opportunity, you can have it but you'd need to get the security clearances.

**MR. ZELINSKY:** Just so we're clear, Your Honor, I just want to be crystal clear with Mr. Mead, understanding his skepticism -- although I don't think our job is to convince Mr. Mead of his skepticism; it's the jury. As this Court knows, this Court has CIPA proceedings in other cases, there's a number of steps. It's not that we're going to file a motion and wave a wand and Mr. Mead gets to go sit at the CIA and rummage about. Once the CIPA proceeding is initiated, counsel has to get clearances. Once counsel has clearances, we have to seek authority to be able to use certain information. As I stand here today, I can neither confirm nor deny the existence of such information. Assuming such

4

> information exists, I cannot represent to the Court that we would be in a position to admit such information.
>
> What I can tell the Court is there's -- the whole reason we enacted CIPA was to prevent graymailing, which is to prevent saying, "Okay, give me everything you've got, I want all of the intelligence information." There's a process. It's an interagency process. Certainly assistant United States attorneys, though we may consider ourselves quite lofty, are nowhere near the people making the decisions in that process.
>
> I just want to set expectations that is why way back many months ago we made clear that we might need CIPA proceedings here. But I just want to level set with the Court and Mr. Mead, who I know does not have familiarity with CIPA proceedings, that it is not as easy as fill out an SF86 and get to go see whatever you want at Langley. It's not going to work that way.
>
> **THE COURT:** Mm-hmm.
>
> **MR. MEAD:** Your Honor, I have tried every which way to avoid graymail. I don't believe in it as a strategy. I'm sorry, I'm trying to be a responsible officer of the court. But I have to tell you, as you know, at least you know my perception of what a jury would think about the Government's evidence was sincere even if it was misguided. And now I'm scared to death, right? I'm representing folks I think are innocent. I thought the Government's evidence was insufficient and, you know, we're looking at round two and when you represent folks you think are innocent and you can't convince a jury of that, it starts to feel like it's on me.
>
> So I am not in a position -- we have another potential classified information type issue in our motion in limine omnibus too which is this idea of making patients turnable as a result -- it may be that your decision on the substantive Counts 2 through 9 may eliminate that issue. In other words, I don't know whether the Government would say on the conspiracy count, one element of the malicious harm might be that they could turn an important political figure based on medical records in which case I'm stuck with the same quandary. I'm skeptical. I might want to ask the Government to see that classified information. I don't know.
>
> **MR. ZELINSKY:** Your Honor, I think we're now a little far afield of where the Court identified we are. ***Mr. Mead needs to speak with his client. If we're going down the CIPA road, we're going to need to delay trial. It's as straightforward as that.***

ECF 188 at 40-45 (Tr. of November 13, 2023 hearing) (emphasis added).

As noted in the above exchange, if the Government is unable to find evidence that supports its argument – that foreign adversaries are in fact seeking medical records of important individuals in the United States – that would be of particular importance to the defense. As Defense Counsel explained again later in the hearing:

> **MR. MEAD:** In civil litigation, the 30(b)(6) testimony that we conducted a reasonable search for evidence that this condition had happened before and we have been unable to find, that is the kind of evidence that comes in in civil courtrooms all the time, and it is important evidence to either a plaintiff or a defendant. As a trial lawyer, I can tell you that is important evidence to our clients. If, if the Government does a reasonable search and says we have found no -- a reasonable search, has not revealed that Russian intelligence seeks, cares or that the revelation of medical records of some political figure are important, then that's an important fact for the jury to hear for the defense. It really is.
>
> **THE COURT:** Then we should postpone it and ask them to run a search and look. Then we go through the security process and we ask them to do that search. If that's information that you think you have to have for the defense, that's a viable option here. Again, I'm not sure you're going to get the comprehensive level but certainly they would at that point do the search, turn over what they can turn over and go from there.

*Id*. at 58-59.

After the Government brought up CIPA in response to several other issues, including Defendants' other motions in limine, the Court instructed Defendants to decide whether they intend to pursue CIPA. Government counsel said that they had repeatedly expressed to Defense Counsel that the Government would facilitate the process if Defendants wished to get clearances:

> THE COURT: I take the point that both of you are making. But I think that puts us back where we were before the break which is that then we need to go down the CIPA route, and we get what we get from the CIPA route which may be helpful to you-all, may not be. We just don't know what we're going to get. But if it's that

> fundamental of a point that you wish to be able to raise, I want to be very clear that we are not in any way preventing us from going down that path; then we postpone the trial, we do the security clearances. We make the requisite -- I don't know if you have anything else to add, Mr. Zelinsky, but I think that's what we would do.
>
> MR. ZELINSKY: The Court has accurately summarized the situation. We apply for defense counsel for security clearances. The Government undergoes -- as this Court knows, there are multiple stages to the CIPA process. We have from the beginning of this trial been willing to do that. ***We have repeatedly expressed to defense counsel if they wish to get clearances, we would move to facilitate that as we do in every case. That was not defense counsel's request.*** I just want to set out the timetable this is not a magic wand that gets waved. Of course, the defendant has a right to have counsel of their choosing. We will work to the extent that we can get counsel cleared.

*Id*. at 61-62.

At the conclusion of the hearing, the Court gave Defendants 24 hours to decide whether they intended to pursue CIPA. On November 14, 2023, Defendants reluctantly advised the Court that they intended to engage in the CIPA process.

That same day, the Government responded: ***"We will work to initiate the process of the security clearance application procedure for you and your co-counsel."***[1] In a second email to Defense Counsel that day, the Government wrote:

> ***We will be in touch about paperwork for clearances*** – as you know it's not in our power to grant such clearances or approve your suitability and need to apply for them. . . It would be helpful therefore to confirm that you seek information regarding whether: (a) private health information of individuals has been previously sought by our own and/or other foreign governments. (b) whether private health information has been or could be used by our own or foreign governments. (c) evidence of activities of the

---

[1] Email chain from November 14, 2023 to November 21, 2023, attached as Exhibit 1

> Russian intelligence network to harm people in the United States.
> If this summarizes the information you seek, please confirm.

Defense Counsel responded: "We will have some more items. We will confer and send you a list."

One week later, on November 21, 2023, Defense Counsel followed up on the status of the security clearance applications: "Just following up re the status of our security clearance paperwork. . . We are still working on finalizing a list of information we would hope to receive through the CIPA process and will get that to you shortly."

That same day, the Government responded: "Thanks. We cannot make any requests for clearances – or even seek a determination from the relevant stakeholders if they are necessary – until we receive the request from you for information. That's why I immediately emailed with the request below. Such a request triggers the process and indicates a possible need to know. We cannot just ask for clearances ourselves. That's not how the process works."

An hour later, Defense Counsel promptly provided the following 17 requests:[2]

1. Anna's call to the Russian embassy
2. All investigative/case files on Anna and/or Jamie
3. All investigative results indicating that Anna and/or Jamie expressed support for, and a desire to help, Ukraine and its people
4. All investigative results indicating that Anna and/or Jamie did not support the Russian Government's attack on Ukraine, were critical of the Russian Government or its leaders, and expressed desires to help the Russian people, as opposed to its government

---

[2] Given the Government's request for a comprehensive list, Defendants added several requests beyond what the parties discussed at the November 13, 2023 hearing. Many of these requests go to potential defenses that the Defendants had to forego when they previously decided to pursue a speedy trial and not engage in CIPA.

8

5. All documents related to the decision to pursue an UC investigation
6. The UC's prior work as an undercover
7. The UC's personnel file, including but not limited to her training on investigative techniques
8. All documents, including texts and emails, between all counsel and agents involved in the investigation related to and/or preparing for the August UC meetings
9. Documents related to whether private health information of individuals has been previously sought by our own and/or other foreign governments
10. Documents related to whether private health information has been or could be used by our own or foreign governments
11. Evidence of, or reports related to, activities of Russian intelligence network to harm people in the United States
12. All preventative measures taken to prevent Russian intelligence from causing harm in the United States
13. All documents reporting a concern that Russian Intelligence may cause harm in the United States
14. All evidence related to communications with the UC, including but not limited to directions given at any time and what she reported after each meeting
15. All evidence that the general health conditions of U.S. and/or Russian military personnel is widely and publicly available to one or both governments
16. All evidence of considering potential charges, including espionage and/or any other charges considered, and the decision on whether or not to charge
17. All evidence that would fall under Rule 3.8 and/or Brady.

The Government responded: ***"Thanks for the response. We will request three clearances.*** As I'm sure you know from your firm's prior work, this is not a fast process. But we'll keep you up aware as things progress."

On December 7, 2023, after not hearing anything for just over two weeks, Defense counsel wrote: "We haven't heard anything about getting the security clearance process started. Can we please get an update?"[3]

---

[3] Email chain on December 7, 2023, attached as Exhibit 2.

The same day, the Government responded: "We are in discussions regarding your requests. I expect we will have some follow up questions surrounding your discovery requests prior to beginning any clearance process, since your requests are significantly broader than we had originally anticipated given your prior statements. We'll be back in touch as soon as we can."

On January 27, 2024, after not hearing anything more from the Government for over a month, Defense Counsel wrote:[4]

> Hope all's well, and sorry to bother you on a weekend, I've been buried the last several weeks and I'm stuck on my keyboard on a Saturday trying to catch up.
>
> Our clients reluctantly agreed to delay trial on the Government's representation that it would implement CIPA procedures to resolve issues over Defendants' requests for exculpatory information, or to exclude certain government arguments. It's been more than two months, and the government still hasn't even initiated the process to get security clearances for defense counsel.
>
> Please let us know what's going on, and provide a timetable for a government response to our requests.

On February 2, 2024, the Government responded and suggested scheduling a telephone conference to review the Defendants' November 21st requests. On February 5, 2024, the Government and Defense Counsel had a phone conference for just over an hour.  The entire call was spent going over the list defense counsel had provided to the Government on November 21, 2023, over two and a half months earlier.  The Government wanted to go over each item on the list to better understand them.

---

[4] Email from January 27, 2024, attached as Exhibit 3.

On February 21, 2024, Government sent an email asking for a second telephone conference. On February 22, 2024, Defense Counsel and Government Counsel, including an attorney from the Department of Justice's National Security Division, had a second conference to review the list of requests again. In a complete reversal from the Government's earlier position at the November hearing, the takeaway from the conference was that the Government did not believe it was necessary to pursue CIPA after all. The Government advised that it would draft a status report identifying the issues they believed appropriate to take up with the Court and would email it to defense counsel to review.

On March 10, 2024, after again not hearing more from the Government, Defense Counsel wrote:[5]

> Our client's lives are on hold. It has been five months since we reluctantly invoked the CIPA process at your suggestion. Despite saying you would immediately start the process for getting defense counsel security clearances, you never did so.
>
> We had a conference call on February 22, and you promised to send us a written proposal intended to provide the Court with some sort of status report on CIPA issues and a framework for the issues we could not agree on, and therefore would be the subject of defense motions. We still don't have your draft.
>
> It appears that we are at an impasse on getting access to any hypothetical tapes of any calls to the Embassy if the Government is not willing to expand our stipulation that the call was innocuous and not evidence of an intent to harm the U.S. or patients. The government argued in closing that Dr. Gabrielian's reference to Jamie as a military doctor was somehow proof that she always intended to contact Russian intelligence. We believe that the entire context of the conversation would disprove that argument.

---

[5] Email chain from March 10-11, 2024, attached as Exhibit 4.

> We also appear to be at impasse if the Government still intends to make arguments that were the subject of our motions in limine and on the matters we have discussed but could not agree on.
>
> We hope to file something with the Court this week. We would prefer to incorporate your draft/response. Please let us know a date certain when you will provide your draft.

That same day, the Government responded:

> Thanks for the note.
>
> We are in the process of finalizing our expert on the matter we discussed at the core of many of the outstanding issues relating to the interest in medical records by foreign governments (and our own).
>
> As we discussed, such an expert would likely moot many of the issues you identified, though of course you could call your own. We expect to have an expert named by the end of this coming week (though not formally under contract). If you'd like to wait until that time, that may spare the court some time and narrow our subjects of disagreement substantially.
>
> As for the stipulation: if there are facts you would like added to the stipulation, we are open to considering them (e.g., "Dr. Gabrielian did not mention medical records"). We cannot add descriptions of her mental state or descriptions of the call beyond the facts of what happened (e.g. "innocuous") as that is argument, not fact.
>
> We propose proving you a draft by end of week with information about our expected expert. We will then await your response.
>
> We understand your client's currently-stated desire for a quick resolution. That is why we went to trial quickly in May 2023 and did not oppose a retrial several weeks later when the judge proposed it. And we were ready for trial in November 2023 again as well.

Believing that such an expert would only exacerbate the need to share potentially classified information, on March 11, 2024, the Defense Counsel wrote:

12

> My initial thought is that designating an expert will only amplify the need for the Government to produce contrary information, classified or not.
>
> Your email did not promise a date certain for the draft you promised addressing various issues. Are you saying you only intend to provide an expert disclosure this week?

That same day, the Government wrote:

> As we discussed we would produce information that contradicted out expert if we had it. We do not have such information and have no reason to believe it exists.
>
> We will provide a full draft. My instinct now is to inform the Court that (1) We have been consulting as directed to by the Court (2) The Government does not believe security clearances are needed for counsel; and (3) Counsel for the defendants plan to file additional motions regarding this matter."
>
> Do you think we should include more?

Defense Counsel responded:

> On behalf of both defendants, I am responding here to the email below (today at 11:43 a.m.):
>
> We disagree that this process has followed what the Court directed or the Government said would happen. We will file our own motions/report with the Court.

On March 15, the Government wrote:[6]

> As discussed, we are providing the name of our intended expert. This is not a formal expert disclosure since no trial dates have been set by the Court but rather a good faith attempt to give you the information we have put together in response to your questions.
>
> At this point, we plan to call Rose McDermott of Brown University. Professor McDermott does not have a security clearance and we believe has never possessed a clearance. We anticipate she will testify about how private health information of individuals has been previously sought by our own and/or other

---

[6] Email chain from March 15 to April 3, 2024, attached as Exhibit 5.

13

> foreign governments, and how private health information has been or could be used by our own or foreign governments. Once we have her formally under contract we plan to produce a more fulsome summary for you on a litigation timeline.
>
> As discussed, our understanding is that you will file a separate status with the Court. As we also discussed, our plan is to file a standard Speedy Trial Act motion with the Court as is our usual procedure (we understand you have already filed one when you made your initial request for discovery – ours will be in addition and is just our regular policy). David has consented to an exclusion through May 1. Chris: you were going to check and consent. Can you confirm your consent?

On April 3, 2024, Defense Counsel again pushed back on the Government's suggestion that its proposed expert would resolve the CIPA issues:

> In the March 10 email below you promised a more fulsome expert witness disclosure. The email below falls far short of the requirements for an expert witness disclosure, and does not provide any guidance in terms of how this potential expert would resolve the issues that led us to reluctantly ask for a postponement to pursue CIPA information. Please let us know when you plan to make an expert disclosure.

That same day, the Government responded:

> I think there's some confusion, which I hope we can clear up.
>
> We did not intend the below as our formal expert disclosure as I noted at the time I sent it. As we indicated below, we plan to provide a more complete disclosure when we have received a timeline for the Court for such disclosures. In the interest of narrowing (or resolving) CIPA issues, we made the disclosure below. We believe they are adequate for determining which issues you have identified that our expert will speak to, and therefore which can be disposed of without any need for any discussion of any potential classified information.
>
> As I stated, we anticipate she will testify about how private health information of individuals has been previously sought by our own and/or other foreign governments, and how private health information has been or could be used by our own or foreign governments.

14

We believe this will address items 9 and 12 of your initial request, which I have appended below:

> 9. Documents related to whether private health information of individuals has been previously sought by our own and/or other foreign governments
>
> 10. Documents related to whether private health information has been or could be used by our own or foreign governments

I believe we have a continuing disagreement about item 1: Any call to the Russian Embassy if such recordings were to exist.

We do not believe that there is relevant information regarding items 11-13, which we have previously stated are overbroad.

> 11. Evidence of, or reports related to, activities of Russian intelligence network to harm people in the United States
>
> 12. All preventative measures taken to prevent Russian intelligence from causing harm in the United States
>
> 13. All documents reporting a concern that Russian Intelligence may cause harm in the United States

We believe we have turned over any relevant information related to the other requests.

In addition, we previously offered on March 10, 2024, to modify the stipulation regarding the call to make clear Dr. Gabrielian did not mention medical records, but stated that we cannot add descriptions of her mental state or descriptions of the call beyond the facts of what happened (e.g. "innocuous") as that is argument, not fact. We are awaiting a response on that proposal.

David also noted on behalf of both clients on March 11 that you intended to file your own status with the Court.

We continue to believe a joint status laying out our areas of disagreement would be best for the Court, and are happy to try to draft such a status again if helpful.

Defense counsel believe that any recordings or transcripts of Dr. Gabrielian's call to the Russian Embassy (if they exist) would rebut Government counsel's argument to the jury that Dr. Gabrielian understood and expected that Russian intelligence would reach out to her after the call. Defense counsel believe that the Government has ample evidence of Russian designs to inflict harm on enemies of the Putin regime, including in the United States. That evidence would rebut Government counsel's argument to the jury that it was unreasonable for Defendants to fear retaliation if they did not agree to the HIPPA violation that Government agents solicited. Defense counsel believe that the Government does not have evidence, classified or unclassified, that Russia intelligence invests any resources in covert operations soliciting medical information about U.S. politicians or citizens from U.S. medical personnel. The absence of such information would rebut an element of the Government's proof that Defendants actions would harm U.S. interests, or that the disclosures of innocuous health information of mid-level government employees would make those employees "turnable."

The *absence* of such information in the classified records of U.S. intelligence agencies is *Brady* and Rule 3.8 exculpatory evidence. Defendants reluctantly delayed trial and invoked CIPA because Government counsel insist on their intention to make arguments to the jury that defense counsel believe are inaccurate and prejudicial.

## CONCLUSION

Five months later, the parties are no closer to resolving the issues that were the subject of the November 13, 2023 hearing. Dr. Gabrielian disagrees with the Government's suggestion that its proposed expert would in any way obviate the need to engage in CIPA. Given this impasse, Dr. Gabrielian respectfully requests a hearing to address these issues. At a minimum, given the Government's reversal and new position that the matters at issue in Defendants' prior motions in limine do not implicate CIPA after all, we would ask the Court to reconsider Defendants' motions in limine.

Respectfully submitted,

SCHERTLER ONORATO MEAD & SEARS, LLP

/s/ *Christopher Mead*
Christopher Mead, Bar No. 08661
Noah Cherry, PRO HAC VICE
555 Thirteen Street, NW
Suite 500 West
Washington, DC 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
cmead@schertlerlaw.com
ncherry@schertlerlaw.com

*Counsel for Anna Gabrielian*

CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of April, 2024, a true and correct copy of the foregoing was electronically filed and served on counsel for the United States through ECF.

*/s/ Noah Cherry*