

**U.S. Department of Justice**

United States Attorney
District of Maryland
Northern Division

---

*Aaron S.J. Zelinsky*
*Assistant United States Attorney*
*Aaron.Zelinsky@usdoj.gov*

*Mailing Address:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*Office Location:*
*36 S. Charles Street, 4th Floor*
*Baltimore, MD 21201*

*DIRECT: 410-209-4928*
*MAIN: 410-209-4800*

May 3, 2024

Hon. Stephanie A. Gallagher
U.S. District Judge
District of Maryland

      Re:    <u>United States v. Gabrielian</u>, SAG-22-336

Dear Judge Gallagher:

    The government writes this letter in advance of the Mary 6, 2024 status conference to relay its position regarding whether this case should be dismissed under the Speedy Trial Act (STA), and if so, whether with or without prejudice. *See* ECF 197.

    This case should not be dismissed under the STA. First, the Defendants voluntary and explicitly waived the STA for six months, including for matters distinct from the clearance process at issue here. Second, as the Government repeatedly explained in court and to the Defendants subsequently, the United States Attorney's Office for the District of Maryland could only initiate the clearance process, not guarantee that defense counsel would be cleared or would receive any information. The Government did as was anticipated: it initiated the process based on the request of the defendants' counsel and kept them apprised of the status of their clearance requests, which were ultimately rejected. Finally, if the Court does dismiss the indictment, it should do so without prejudice, because the defendants were on release pending trial and there is no indication that their defense has suffered in any way as a result of the delay.

    **1.  Factual Background**

    *a.  The November 12, 2013 Motions in Limine Hearing*

    On November 12, 2023, one week before retrial was due to start, this Court held a hearing on the defendant's motion in limine to exclude, among other things, testimony and argument that intelligence services attempt to get medical information from foreign adversaries. *See* ECF 166; 11/23/2023 at 40:1-9 (Hereinafter "MIL Tr.").

    At that hearing, the Court stated: "My understanding is that the Government would have information it could put forth if the defense had been cleared but cannot do so under the current circumstances." *Id*. 40:11-13. The Government responded: " I don't think *we can confirm or deny that we would necessarily have information to put forth in those circumstances*. I don't mean to sound overly circuitous, but I think that our position is we had managed to navigate the relatively

treacherous shoal via testimony that was elicited in part by Mr. Mead. I believe it first actually came up on cross-examination, and then on redirect." *Id.* 40:14-20 (emphasis added).

After proposing a potential stipulation regarding public reports as a way to keep the trial date as scheduled, the Government stated: "[T]o the extent that the argument from the defense is 'Well, we haven't seen evidence that medical records are a target of foreign intelligence services, and we would like information as to why medical records of individuals are targets of foreign intelligence services,' that sort of is a core CIPA matter, right? 'We want to know what do you know about what foreign intelligence services know,' and that's right at the core of CIPA." *Id.* 41:7-14.

In response, counsel for defendant Gabrielian responded: "I am deeply skeptical. I don't have a security clearance, I've never worked in national intelligence or whatever else. But I have to tell you I am deeply skeptical about the notion that Russian intelligence has to invest any covert resources in trying to find information about the medical conditions of American politicians, in part, because there is so much publicly available information and, in part, because it's not very helpful to anything they're doing." *Id.* 42:5-13.

The Court then stated: "what Mr. Zelinsky is telling us is he can't tell you right now whether they've got that information or not because, again, we're getting into classified information, but if you want that opportunity, you can have it but you'd need to get the security clearances." *Id.* 43:1-5. The Government responded:

> Just so we're clear, Your Honor, I just want to be crystal clear with Mr. Mead, understanding his skepticism -- although I don't think our job is to convince Mr. Mead of his skepticism; it's the jury. As this Court knows, this Court has CIPA proceedings in other cases, *there's a number of steps*. It's not that we're going to file a motion and wave a wand and Mr. Mead gets to go sit at the CIA and rummage about. Once the CIPA proceeding is initiated, counsel has to get clearances. Once counsel has clearances, we have to seek authority to be able to use certain information. As I stand here today, *I can neither confirm nor deny the existence of such information. Assuming such information exists, I cannot represent to the Court that we would be in a position to admit such information.* What I can tell the Court is there's -- the whole reason we enacted CIPA was to prevent graymailing, which is to prevent saying, "Okay, give me everything you've got, I want all of the intelligence information." *There's a process. It's an interagency process. Certainly assistant United States attorneys, though we may consider ourselves quite lofty, are nowhere near the people making the decisions in that process.* I just want to set expectations that is why way back many months ago we made clear that we might need CIPA proceedings here. But I just want to level set with the Court and Mr. Mead, who I know does not have familiarity with CIPA proceedings, that *it is not as easy as fill out an SF86 and get to go see whatever you want at Langley. It's not going to work that way.*

*Id.* 43:6-44:8 (emphasis added).

The Court then discussed the Defendants request regarding whether an individual had been "turned" because of medical information in the past, and stated that was a "common sense"

2

assessment to be made by the jury that did not required classified information. *Id.* 45:18-19. In response, the Government stated: "I also just want to be clear -- I'm sorry, I don't mean to take this lightly -- but what Mr. Mead is going to get in a CIPA proceeding. It's not like you get a CIPA proceeding and then -- Mr. Cunningham and I are assistant United States attorneys in the District of Maryland. We're not the director of national intelligence. There's no way – I don't know if somebody was turned at some point using medical records and, frankly, the government isn't going to tell me because that's not how the system works." *Id.* 46:8-16.

After further discussion, the Government stated: "Insofar as this is now an eleventh hour request for a security clearance, the Government can accommodate that, but it's going to take some time and we just need to know." *Id.* 49:12-14. The Court called a recess to allow the defendants to consult with counsel. *Id.* 49:23-24.

Upon return, the Court stated to counsel: "I think it is reasonable for people to assume that there is a probably limited but real set of circumstances where a Russian intelligence agency would be very interested in a particularly compromising medical record of some high-level official. Again, I don't think it's probably a broad based -- as you've said before, someone with a scratched cornea probably not a great interest to Russian intelligence, but you can in your head conceive of a situation where there would be a piece of information of a medical nature that would be of interest to Russian intelligence." *Id.* 53:8-18.

The Court then stated: "But if the notion of evidence is going to be in play, that's where I think we run into this issue. If it's going to be in play on either side in terms *of arguments being made by the Government that this evidence exists open source* or by the defense they haven't shown you evidence, I think either way that's where we get into this CIPA situation." *Id.* 53:19-24 (emphasis added).

After the defense claimed that it was entitled to classified information regarding whether foreign intelligence had sought medical records before, the Court responded: "I think you're operating from the presumption that this is information helpful to the defense. I think the Government sees it differently and I think there's a legitimate -- I don't think there's any ethical violation here because I don't think that the Government views whether -- first of all, I'm not sure that whether it's ever happened before is a knowable fact. I think that to some degree is what Mr. Zelinsky was saying earlier." *Id.* 57:8-15. The Court continued: "I think it's arguable that whether it's happened or hasn't happened is not material in terms of exculpatory information for exactly the reason that I was saying earlier; *I don't think it particularly matters.*" *Id.* 58:2-5.

The Court continued: 'If it's information you would like to have, that's fine and if we want to go through the process *of trying to obtain it which is going to delay the trial*, we can do that. I don't think that what you would get at the end of that process would be the type of conclusive, coherent set of information that perhaps you would like to see *because I just don't see how the Government would even begin to search for this information*, nor do I think it's necessarily kept in that manner." *Id.* 58:11-18 (emphasis added).

In response, defense counsel stated that it wanted: "Government does a reasonable search and says we have found no -- a reasonable search, has not revealed that Russian intelligence seeks, cares or that the revelation of medical records of some political figure are important, then that's an important fact for the jury to hear for the defense." *Id.* 59:1-5. In response, the Court stated: "Then

3

we should postpone it and ask them to run a search and look. Then we go through the security process and we ask them to do that search. If that's information that you think you have to, have for the defense, that's a viable option here. Again, I'm not sure you're going to get the comprehensive level but certainly t*hey would at that point do the search, turn over what they can turn over and go from there*." *Id.* 69:7-14 (emphasis added).

After a further colloquy, the Court stated: "I want to be very clear that we are not in any way preventing us from going down that path; then we postpone the trial, we do the security clearances." *Id.* 61:14-16. In response, the Government stated: "The Court has accurately summarized the situation. We apply for defense counsel for security clearances. The Government undergoes -- as this Court knows, there are multiple stages to the CIPA process. We have from the beginning of this trial been willing to do that. We have repeatedly expressed to defense counsel if they wish to get clearances, we *would move to facilitate that as we do in every case. That was not defense counsel's request.* I just want to set out the timetable *this is not a magic wand that gets waved.* Of course, the defendant has a right to have counsel of their choosing. *We will work to the extent that we can get counsel cleared. I do not, as the Court knows, control the clearance process. Mr. Cunningham does not control the clearance process, so that takes time.* A CIPA proceeding takes time. We sometimes have the interagency consultation proceeding takes time. All of that is fine, but there is no conceivable way we're going to be able to keep the trial date with that." *Id.* 61:19-62:11 (emphasis added).

The Government further stated: "we are a bit disappointed that this issue is being raised for the first time when we are so close to trial when obviously we have made -- there have been people that we have to get here. As the Court knows and the defense counsel knows, one of them has a quite busy schedule and does a fair amount of work that can't -- it's not easy to get her places that conveniently. And we have always worked with defense counsel to accommodate every request that they have had on these matters, and we are just a bit disappointed that so close to trial, we're moving into this." *Id.* 63:12-21. The Court stated it would give the defendants an additional 24 hours to consider the matter and stated that, "I am willing to give the 24 hours. I understand the frustration that we're a little bit late in the game." *Id.* 64:10-12.

The Government responded: "I just want to put on the record, just so there's no confusion -- I think the Court has already spoken to it. I don't think the defense, even if we go all the way down this, is going to like what they end up getting. First of all, CIPA is not a get-to-go-rooting-through-Langley field expedition. As the Court knows from other cases, there's a set of procedures here for a very important reason. I don't even know how we would begin to go about determining whether in United States history, first of all, someone has been flipped this way by the Russians because by definition we might not know everybody that's been flipped. I don't know how to determine who we've flipped and how. *I do think we could end up getting to a place where we could have some testimony that talks about the importance of these records, and it could outline, you know, in some way essentially what the Court has said; it seems common sense would dictate that there are these situations.* But I just want to be clear that this is a road we can go down, but *even if the defendant goes down that road, I am not confident that the road is going to end where the defendant would like it* which is being able to say you looked through all of the CIA's files from the last however many years, and since 1789, this has never happened. We'll get to that when we get to it, but I just want to set expectations." *Id.* 64:20-65:18.

4

The Court responded: "I think that's clear. We've made a record at this point that *there's no guarantees about what the outcome of the CIPA process will be*, and the defendants just want some time to mull over the decision." *Id.* 65:19-22. The Court then proceeded to consider other motions in limine issues unrelated to these matters.

b. *The Defendant's Motion for Exclusion of Time Under the Speedy Trial Act*

Three days after the hearing, the defendants filed a motion for exclusion of time under the Speedy Trial Act for six months, stating that:

> The Defendants agree that an initial period of six (6) months' delay in order to pursue relevant matters through CIPA procedures is reasonable and hereby agree that such six (6) months period ought to be excluded under the Speedy Trial Act, 18 U.S.C. § 3161. Specifically, Defendants respectfully submit, subject to the Court's assessment, of course, that such time period should be excluded under 18 U.S.C. § 3161 (h)(7)(A), based on a belief that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the Defendants in a speedy trial, and after a consideration of the relevant factors under 18 U.S.C. § (h)(7)(B). Government counsel has authorized the undersigned to represent to the Court that the Government agrees that this section of the Speedy Trial Act justifies a six (6) months continuance and the exclusion of this six (6) months period from the time calculation under the Act. *Defendants also believe that, given the unresolved status of certain unresolved pre-trial motion issues discussed during the Status Conference, the six (6) months time period also is properly excludable under 18 U.S.C. § 3161 (h)(1)(D).*

ECF 184, at 2 (emphasis added).

c. *The Government Initiates the Security Clearance Process and Contacts the National Security Division*

The Government immediately wrote to defense counsel that same day, November 14, 2023, to initiate the security clearance process, as it had stated it would do. The Government wrote: "*as you know it's not in our power to grant such clearances or approve your suitability and need to apply for them*," and summarized the three areas it understood the defendants to be requesting more information. ECF 194-1, at 4 (emphasis added). The following week, defense counsel inquired about the status of their clearance applications, and the Government responded: "*We cannot make any requests for clearances – or even seek a determination from the relevant stakeholders if they are necessary – until we receive the request from you for information. That's why I immediately emailed with the request below. Such a request triggers the process and indicates a possible need to know. We cannot just ask for a clearance ourselves. That's not how the process works.*" *Id.* at 2.

In response, defense counsel wrote back a request that dramatically expanded the scope of information request, including, "All preventative measures taken to prevent Russian intelligence from causing harm in the United States" and "All documents reporting a concern that Russian Intelligence may cause harm in the United States." *Id.* at 2. The Government told defense counsel

that it would request clearances, and expressed concern that the scope of the requests were now "significantly broader than we had originally anticipated given your prior statements." *Id.* at 2.

The Government subsequently communicated with the National Security Division at the Department of Justice, the lead component for considering such requests and passed along the Defendants' expansive request for information and clearances. After these consultations, the National Security Division determined, at a minimum, that additional information was needed to needed in order to demonstrate there was a need to know in this matter.  On February 2, 2024, the Government spoke with the Defendants and asked them about their request, in particular the substantial breadth and scope of the requests, as well as more precision on the types of information the defendants were requesting.  The Government again consulted with the National Security Division, and was informed that the position of the United States was that there were not relevant and discoverable records to which the defendant was entitled, and therefore moving further in the security clearance process was not required in this circumstances. On the February call with defense counsel, the Government discussed that it believed many of the concerns raised by the defendant – in particular the use and utility of medical records to foreign adversaries – could be addressed by unclassified testimony of an expert, and that the Government would work to notify the Defendant when such an expert had been identified.

On March 11, 2024, the Government indicated it planned to file a joint status report. Defense counsel stated they would file their own report with the Court. ECF 194, at 13.

On March 15, 2024, the Government informed the defense that it planned to call Professor Rose McDermott of Brown University. The Government stated that "Professor McDermott does not have a security clearance and we believe has never possessed a clearance. We anticipate she will testify about how private health information of individuals has been previously sought by our own and/or other foreign governments, and how private health information has been or could be used by our own or foreign governments. Once we have her formally under contract we plan to produce a more fulsome summary for you on a litigation timeline." ECF 194, 13-14.  These areas of inquiry were identical to two areas of information the defendant had requested in its November request.

On April 3, 2024, the Government again emailed counsel regarding their twelve-point request, and provided a point-by-point discussion of what would be addressed Professor McDermott, what had already been turned over, and what was considered not relevant. On April 25, 2024, the defendants filed their status reports.

**2. Dismissal Under the Speedy Trial Act is Not Warranted**

*a. The Defendant's Waiver Did Not Rely Exclusively on Seeking Security Clearances*

In their motion to exclude time under the Speedy trial Act, the defendants made clear that seeking security clearances was not the only reason they were waiving their rights under the Speedy Trial Act for six months.  After discussing their desire to seek clearances, the Defendants stated: "Defendants *also believe* that, given the unresolved status of *certain unresolved pre-trial motion issues* discussed during the Status Conference, the six (6) months time period also is properly excludable under 18 U.S.C. § 3161 (h)(1)(D)." ECF 184, at 2.  In other words, the Defendants motion for exclusion rested on other grounds—the existence of still pending decision

on motions the defendants had filed. That grounds alone is independent reason to find the waiver proper under the Speedy Trial Act, and thus no dismissal is warranted.

    b. *The Government Initiated the Security Clearance Process and Determined the Defendants' Attorneys Did Not Have a Need to Know Basis for Obtaining Clearances*

At no time in this case has the Government promised the Defendants that their attorneys would receive security clearances. Indeed, as recounted numerous times above, the Government consistently stated that it is *not* within the power of the District of Maryland AUSAs to grant clearances, that consultation is needed, that the process to obtain clearances is lengthy, and that the defendant was unlikely to succeed in obtaining information.

The Government emphasized on November 14, 2023, to initiate the security clearance process. The Government stated on the same day the Defendants filed a motion for exclusion: "it's not in our power to grant such clearances *or approve your suitability and need to apply for them*." ECF 194-1, at 4. Indeed, in the hearing, the Government sought to make as clear as possible that, "We will work *to the extent that we can get counsel cleared. I do not, as the Court knows, control the clearance process*. Mr. Cunningham does not control the clearance process, so that takes time." In fact, the parties are now almost precisely where Government counsel anticipated we would end up: "a place where we could have some testimony that talks about the importance of these records, and it could outline, you know, in some way essentially what the Court has said; it seems common sense would dictate that there are these situations [where medical records have intelligence value." What's more, the Government fully expects Professor McDermott to speak about past instances when intelligence services have sought, obtained, and used medical information to their advantage.

The Government did exactly as proposed. It promptly initiated the security clearance process for the defendants. The first step in any security clearance process is demonstrating a need to know The Government requested information from the Defendant to demonstrate a need to know, and then conveyed that request to the Department of Justice National Security Division (NSD), because the District of Maryland United States Attorney's Office does not have the power to grant security clearances. After discussion as promised, the Department of Justice determined that there was no classified information to which the defendant was entitled, and therefore it would be a waste of time and resources to clear the defendants' counsel. In an attempt to meet some of the information the defendants sought, the Government found an expert who can testify in an unclassified setting to what the defendants believe to be a critical issue in this case—the "common sense" understanding that medical records could benefit a foreign adversary. The Government has also offered to modify the stipulations used in the first trial, but has received no substantive response back from the defendant regarding its proposals.

    c. *The Government Has Consistently Sought to Try the Case as Soon as Possible*

In deference to the Defendants' wishes, this Court put this case on expedited schedule, and this case was first tried within 8 months of indictment. Following the 11-1 hung jury, the Court offered the parties the opportunity to try the case again several weeks later. The Defendants declined. The Government did not.

The Government was again ready to try the case in November 2024, when the Defendants again declined and raised last-minute issues over a year after indictment regarding a request for

potentially classified information.  The Government moved expeditiously to initiate the security clearance process. It promptly notified the Defendants when there was a determination that the process had come to an end because there was no relevant information to which the defendants were entitled.  All of this was done to expedite trial.  In the alternative, perhaps defense counsel would rather the Government could have undertaken the full process to obtained security clearances for defense counsel, only to tell them much later that there was no evidence to which they were entitled.  That would have wasted time and needlessly prolonged pretrial proceedings. Instead, the government initiated the clearance process and promptly informed counsel of the results of that process (a denial) and then sought to find an expert to move the case to trial as rapidly as possible.

The Government was crystal clear that with the defendants at the hearing—and again on the same day the defendants waived their rights under the Speedy Trial Act, that "it's not in our power to grant such clearances *or approve your suitability and need to apply for them*." ECF 194-1, at 4 (emphasis added). Throughout the process, the Government continued to emphasize that it could only make a "request for clearances – – or even seek a determination from the relevant stakeholders if they are necessary –[based] the request from you for information." ECF 194, at 8.

The Government passed on the defendants' attorneys' request for clearances. The requests were denied. The case should now proceed to trial.

### 3. If the Indictment Is Dismissed, It Should Be Without Prejudice

If the Court nevertheless decides to dismiss the indictment, such dismissal should be without prejudice.

In considering whether to dismiss a case under the Speedy Trial Act with or without prejudice, the Court must examine: "among others, each of the following factors: [1] the seriousness of the offense; [2] the facts and circumstances of the case which led to the dismissal; and [3] the impact of a reprosecution on the administration of this chapter [18 U.S.C. §§ 3161 et seq.] and on the administration of justice." 18 U.S.C. § 3161(a).

Here, there is no question that the offense is serious. The Defendant's are charged with a conspiracy to turn over medical information in order to do malicious harm to the United States of America, among other things. Dr. Henry, then an active-duty military officer with a security clearance, and Dr. Gabrielian are charged with having provided patient information to an individual they believed to be an agent of the Russian Government in exchange for their own personal benefit.

The facts and circumstances, as detailed above, cut in favor of the Government. The Defendant requested the exclusion, and at no time (even now) has it requested dismissal under the Speedy Trial Act. The Government regularly informed the Defendant of what was transpiring and was forthright about the state of the clearance process. At no time did the Defendants indicate they wished to rescind their waiver of Speedy Trial.

"[W]hen considering [a] delay's adverse impact on the defense, courts 'consider three interests of defendants: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and

8

concern of the accused; and (iii) to limit the possibility that the defense will be impaired" *United States v. Robinson*, 55 F.4th 390, 400 (4th Cir. 2022).

As to the first factor, the defendants in this case have been released on bail, and the Government has promptly consented to every request from defense counsel to allow the defendants to travel for work and leisure, and apply for jobs while on release; in addition. *See United States v. May*, 819 F.2d 531, 534 (5th Cir. 1987) ("[the defendant[ was free on bail and permitted to travel throughout the period of delay."). There has been, for instance, no spoliation of evidence in this case. *United States v. Koerber,* 813 F.3d 1262 (10th Cir. 2016). Nor has there been any allegation that the defense has been in any way impaired by the delay. *See United States v. Reavis, 48 F.3d 763, 770 n.2 (4th Cir. 1995)*.

That leaves only the second factor, minimizing the "anxiety and concern of the accused." But the defendants' claim of anxiety as a result of the pending charge alone "is insufficient on its own to establish prejudice." *See United States v. Ballard*, 727 F. App'x 757, 761 (4th Cir. 2018); *accord United States v. Brooks*, ELH-20-34, ECF 93, at 55 (D.Md. March 19, 2024) ("Moreover, defendant's "generalized claims of anxiety [and concern] are insufficient to establish prejudice.")

4. **Conclusion**

The Government stands ready, as it always has, to try this case promptly. The Government initiated the security clearance process and promptly informed the defendants of the results. At no time did the defendants indicate they wished to withdraw their STA waiver, and their STA waiver was based on other pending matters as well. As for prejudice, the defendants have been free on release conditions, and have not had their case impacted in any way. The offenses charted here are serious and deserve a trial.

Very truly yours,

Erek L. Barron
United States Attorney

By:_____/s/_____
Aaron S.J. Zelinsky
P. Michael Cunningham
Assistant United States Attorneys